1 | R. Joseph Barton, California Bar # 212340
Block & Leviton, LLP
2 | 1735 20th Street NW
Washington, DC 20009
3 | Tel: (202) 734-7046
Fax: (617) 507-6020
4 | Email: jbarton@blockesq.com

5 | Joseph Creitz, California Bar # 169552
CREITZ & SEREBIN LLP
6 | 100 Pine St., Suite 1250
San Francisco, CA 94111
7 | Tel: (415) 466-3090
Fax: (415) 513-4475
8 | Email: joe@creitzserebin.com

9 | Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| ANTONIO HURTADO, CHRISTOPHER ORTEGA, JOSE QUINTERO, MARITZA QUINTERO, JORGE URQUIZA, and MARIA VALADEZ, individually and on behalf of a class of all others similarly situated, | Case No: |
| Plaintiffs, | **COMPLAINT FOR VIOLATIONS OF ERISA** |
| vs. | **CLASS ACTION** |
| RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK OWNERSHIP PLAN COMMITTEE, GERALD MOFFATT, JEFF SNOW, GREGORY RANGE, JON BLACK, CATHARINE ELLINGSEN, BILL EGGLESTON, GREATBANC TRUST COMPANY, REPUBLIC SERVICES, INC., | |
| Defendants, | |
| and | |
| RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK OWNERSHIP PLAN. | |
| Nominal Defendant. | |

2165423.1

Plaintiffs Antonio Hurtado, Christopher Ortega, Jose Quintero, Maritza Quintero, Jorge Urquiza, and Maria Valadez, by and through their attorneys, allege as follows:

## JURISDICTION & VENUE

**Subject Matter Jurisdiction.**

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States and pursuant to 29 U.S.C. § 1132(e)(1), which provides for federal jurisdiction of actions brought under Title 1 of ERISA.

**Personal Jurisdiction.**

2.      This Court has personal jurisdiction over Defendants because Defendants transact business in and have significant contacts with this District, and because ERISA provides for nationwide service of process pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

**Venue**.

3.      Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Rainbow ESOP is and was at the relevant times administered in this District, the breaches and violations giving rise to the claims occurred in this District, and at least one, and in fact many, of the Defendants may be found in this District. Venue is also proper under 28 U.S.C. § 1391(b) and (c) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and one or more of the Defendants reside in this District.

## NATURE OF THE ACTION

4.      This action is brought pursuant to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 *et seq.*, by Plaintiffs on behalf a class of participants in and beneficiaries of the Rainbow Disposal Co., Inc., Employee Stock Ownership Plan ("the ESOP" or "the Plan") to

restore losses to the Plan and to remedy Defendants' breaches of fiduciary duty and violations of ERISA arising out of an October 2014 transaction.

5.   Prior to October 1, 2014, the Rainbow ESOP owned 100% of Rainbow Disposal.  Plaintiffs are current and former employees of Rainbow Disposal and participants with many years of service (or their beneficiaries) and significant amounts of their retirement in the Rainbow ESOP and were invested in Rainbow Disposal, 100% employee-owned company via an employee stock ownership plan.

6.   On October 1, 2014, Republic Services purchased 100% of the stock of Rainbow Disposal from the Rainbow ESOP. This sale was accomplished without the involvement or vote by the ESOP participants despite being referred to as "employee owners" of Rainbow, was accompanied by self-dealing by Rainbow officers and directors, and was approved by a trustee that has been the subject of multiple lawsuits by the Department of Labor for breaches of fiduciary duty arising out of multiple ESOP transactions at other companies. Both prior to and after the sale, the ESOP participants were provided scant, and often confusing or misleading information by the ESOP fiduciaries about the sale, the terms of the sale, the value of their stock, or status of distributions of the assets from the sale.  Despite relying on a stale June 30, 2014 valuation to determine fair market value, the sale price was significantly below the June 30, 2014 valuation.

7.   Nearly three years after the October 1, 2014 sale, the proceeds of the sale received by the Rainbow ESOP have still not been fully distributed to the ESOP participants as promised.  Recent ERISA-mandated disclosures revealed that the current fiduciaries of the Rainbow ESOP have left approximately $15 million in Plan assets – which are supposed to be distributed to the ESOP participants – essentially uninvested and undiversified for nearly three years.

8.   Plaintiffs have attempted to obtain information and documents about the sale and the status and expected distribution of the proceeds, but their efforts

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK OWNERSHIP PLAN COMMITTEE et al.,* COMPLAINT - 3

have been rebuffed by the very fiduciaries who are supposed to be acting in their best interests.  The information that Plaintiffs have been able to obtain from filings that the fiduciaries or Republic were legally required to disclose has often conflicted with the scant information provided by the ESOP fiduciaries.

9.     Through this action, Plaintiffs seek to enforce their rights under ERISA and the Plan, to recover the losses incurred by the Plan as a result of the breaches of fiduciary duty under ERISA or other violations, and to ensure that the Plan and its assets have been properly administered, managed, held in trust and distributed. Among the relief sought for these breaches and violations, Plaintiffs request the breaching fiduciaries be ordered to pay the losses to the Plan, to disgorge any profits, to provide an accounting, to have a surcharge imposed against them, and appropriate equitable relief against any non-fiduciaries and that any monies recovered for the Plan be allocated to the accounts of the Class.

## PARTIES

**Plaintiffs**

10.     Plaintiff Antonio Hurtado is a current employee of Republic Services and Rainbow Disposal with over 40 years of service. As of October 1, 2014, he was a vested participant in the Plan. As of October 17, 2014, Mr. Hurtado had 28,576.5027 shares in his Rainbow ESOP account. He is a participant of the Rainbow ESOP within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7) including because he has a colorable claim for additional benefits as a result of Defendants' fiduciary breaches.  He currently resides in Westminster, California.

11.     Plaintiff Christopher Ortega is a former employee of Republic Services and Rainbow Disposal with over 9 years of service. As of October 17, 2014, Ortega was a vested participant in the Plan and had 3,498.4898 shares in his Rainbow ESOP account. He is a participant of the Rainbow ESOP within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7) including because he has a

1  colorable claim for additional benefits as a result of Defendants' fiduciary

2  breaches.  He currently resides in Huntington Beach, California.

3         12.    Plaintiff Jose Quintero is a current employee of Defendant Republic

4  Services and Rainbow Disposal with twenty-seven years of service. As of October

5  17, 2014, Quintero was a vested participant in the Plan and had 17,960.7073 shares

6  in his Rainbow ESOP account. He is a participant of the Rainbow ESOP within the

7  meaning of ERISA § 3(7), 29 U.S.C. § 1002(7) including because he has a

8  colorable claim for additional benefits as a result of Defendants' fiduciary

9  breaches.  He currently resides in Santa Ana, California.

10        13.    Plaintiff Maritza Quintero is the daughter and beneficiary of Plaintiff

11 Jose Quintero. She is a beneficiary of the Rainbow ESOP within the meaning of

12 ERISA § 3(8), 29 U.S.C. § 1002(8) because she has been designed by her father as

13 one of the beneficiaries in the Rainbow ESOP.  She currently resides in Santa Ana,

14 California.

15        14.    Plaintiff Jorge Urquiza is a current employee of Republic Services and

16 Rainbow Disposal with over twenty years of service. As of October 17, 2014,

17 Urquiza was a vested participant in the Plan and had approximately 25,000 shares

18 in his Rainbow ESOP account. He is a participant of the Rainbow ESOP within the

19 meaning of ERISA § 3(7), 29 U.S.C. § 1002(7) including because he has a

20 colorable claim for additional benefits as a result of Defendants' fiduciary

21 breaches. He currently resides in Huntington Beach, California.

22        15.    Plaintiff Maria Valadez is an employee of Republic Services and

23 Rainbow Disposal with ten years of service. As of October 17, 2014, Valadez was a

24 vested participant in the Plan and had 2,336.4928 shares in her Rainbow ESOP

25 account. She is a participant of the Rainbow ESOP within the meaning of ERISA §

26 3(7), 29 U.S.C. § 1002(7) including because she has a colorable claim for

27 additional benefits as a result of Defendants' fiduciary breaches. She currently

28 resides in Anaheim, California.

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK
OWNERSHIP PLAN COMMITTEE et al.*, COMPLAINT - 5

**Defendants**

16.    Defendant Rainbow Disposal Co., Inc. Employee Stock Ownership Plan Committee ("ESOP Committee") is identified as the plan administrator in the Summary Plan Description within the meaning of ERISA § 3(16)(A), 29 U.S.C § 1002(16)(A). As a result, the Committee and its members are and were fiduciaries of the Rainbow ESOP within the meaning of ERISA § 3(21), 29 U.S.C § 1002(21), because the Committee and its members have discretionary authority or discretionary responsibility for the administration of the Plan.

17.    Defendant Gerald ("Jerry") Moffatt is the former Executive Chairman for Rainbow Disposal, where he worked for 20 years.  According to a Statement of Information filed by Rainbow Disposal with the State of California Secretary of State on February 3, 2014, Moffatt was the Chief Executive Officer and a member of the Board of Directors at least until October 1, 2014.  After Republic Services acquired Rainbow Disposal on October 1, 2014, Moffatt became the General Manager of Rainbow Disposal, a Division of Republic Services. Between at least March 2009 until at least October 1, 2014, Moffatt was a member of the ESOP Committee. As a result of his position on the ESOP Committee, and as a member of the Board of Directors, Moffatt was a fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C § 1002(21) at least until October 1, 2014.  Mr. Moffat is believed to reside at 6151 Hampshire Drive, Huntington Beach, California 92647.

18.    Defendant Jeff Snow was, according to his Linked-In Profile, the President of Rainbow Disposal between October 2010 and October 2014. According to a Statement of Information filed by Rainbow Disposal with the State of California Secretary of State on February 3, 2014, Moffatt was the Secretary and a member of the Board of Directors at least until October 1, 2014.  After Republic Services acquired Rainbow Disposal, Snow became a Municipal Relationship Manager at Rainbow Disposal, a division of Republic Services.  As a result of his position on the Board of Directors, Snow was a fiduciary of the Plan within the

meaning of ERISA § 3(21), 29 U.S.C § 1002(21) at least until October 1, 2014. Mr. Snow is believed to reside at 7 2nd Street, Leadera Ranch, California 92694.

19.    Defendant Gregory P. Range was a member of the Board of Directors of Rainbow Disposal from at least February 3, 2014 to October 1, 2014 according a Statement of Information filed by Rainbow Disposal with the State of California Secretary of State. Mr. Range is and has been a Managing Director and head of the Los Angeles office of Stout (f/k/a Stout Risius Ross or SRR) a financial advisory firm that among other activities provides advice to and performs valuations for ESOP-owned companies.  According to a January 8, 2015 news release on Stout's website, "Stout served as exclusive financial advisor to Rainbow in connection with its sale to Republic Services and Mr. Stout "led the execution of the transaction." Mr. Range is believed to reside at 3209 Laurel Avenue in Manhattan Beach, California, 90266.

20.    Defendant Jon Black became a member of the ESOP Committee as of October 1, 2014. Defendant Black is and has been from at least August 2011 to the present Vice President, Total Rewards & HR Systems at Republic Services Inc. As a result of his position on the ESOP Committee, Defendant Black was a fiduciary of the Rainbow ESOP within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21).

21.    Defendant Catharine Ellingsen became a member of the ESOP Committee as of October 1, 2014. Defendant Ellingsen also is and has been since at least August 2011 to the present a Senior Vice President, Human Resources at Republic Services Inc.  From June 16, 2016 to the present, Ms. Ellingsen has been Executive Vice President, Chief Legal Officer and Corporate Secretary of Republic Services. As a result of her position on the ESOP Committee, Defendant Ellingsen was a fiduciary of the Rainbow ESOP within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21).

22.     Defendant Bill Eggleston became a member of the ESOP Committee as of October 1, 2014. Defendant Eggleston was from at least January 2010 to at least December 2016, Vice President & Deputy General Counsel at Republic Services Inc. As a result of his position on the ESOP Committee, Defendant Eggleston was a fiduciary of the Rainbow ESOP within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21).

23.     The Committee, Defendant Moffatt and any other members of the Committee before October 1, 2014 are referred to as the Prior ESOP Committee Defendants.  Defendants Black, Ellingsen and Eggleston and the Committee are referred to as the New ESOP Committee Defendants.  The Prior ESOP Committee Defendants and the New ESOP Committee Defendants are collectively referred to the ESOP Committee Defendants.  By virtue of the authority pursuant to the Plan Document and actual exercised by the ESOP Committee Defendants, the Committee and its members were or are fiduciaries of the ESOP within the meaning of ERISA § 3(21), 29 U.S.C § 1002(21), because they have discretionary authority or discretionary responsibility in administering the Rainbow ESOP. Defendants Moffatt, Snow and Range are collectively referred to as the Director Defendants. Pursuant to Section 2 and 17 of the Plan Document, the Rainbow Board of Directors had the power and authority to appoint the members of the ESOP Committee and the Trustee, to accept the resignation of the ESOP Committee.  Pursuant to that authority, the Rainbow Board had a duty to monitor the Trustee's conduct and the ESOP Committee members' conduct, to take appropriate action if those fiduciaries were not adequately protecting the interests of the ESOP participants. At least prior to August 25, 2014, Section 5(d) of the written terms of the Rainbow ESOP provided that the power of either the Committee or the Trustee "to sell shares of Company Stock to any person" was "[s]ubject to the approval of the Board of Directors."  By virtue of the authority pursuant to the Plan Document and actual exercised by the Director Defendants

(including negotiations to sell Rainbow or its stock), the Board of Directors and its members were fiduciaries of the ESOP within the meaning of ERISA § 3(21), 29 U.S.C § 1002(21).  As explained by Mr. Moffatt at a meeting of employees on June 7, 2013, the Rainbow Board of Directors were "appointed" by the Trustee (GreatBanc).  GreatBanc had that authority as Trustee of the ESOP because the ESOP was the sole shareholder of Rainbow Disposal.  Thus, the Board of Directors appointed the Trustee and the Trustee then elected or appointed the Board of Directors.

24.     Defendant GreatBanc Trust Company is, and has been since October 2002, the trustee of the ESOP and is a fiduciary of the ESOP within the meaning of ERISA § 3(21), 29 U.S.C § 1002(21), because it has discretionary authority and discretionary responsibility in the administration of the ESOP. GreatBanc's headquarters are located at 801 Warrenville Road, Suite 500, Lisle, Illinois 60532.

25.     Defendant Republic Services, Inc. is a Delaware corporation with its principal executive office located in Phoenix, Arizona. As a result of its purchase of Rainbow Disposal on October 1, 2014, Republic Services is now the parent corporation of Rainbow Disposal.  Republic Services does business in this District and after its purchase of Rainbow Disposal, has rebranded Rainbow Disposal as Republic Services, including by having Rainbow Disposal's prior website redirect to a Republic Services website and announcing that Rainbow "is now Republic Services."

**NOMINAL DEFENDANT**

26.     Rainbow Disposal Co., Inc. Employee Stock Ownership Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A) ("the Rainbow ESOP"). Upon information and belief, the Plan is or at least until October 1, 2014 was, administered in Huntington Beach, California. At least prior to October 1, 2014, the Rainbow ESOP purported to be a "defined contribution plan" within the meaning of ERISA § 3(34), 29 U.S.C. §

1002(34) and, at least until October 1, 2014, an employee stock ownership plan ("ESOP") under ERISA § 407(d)(6) that was intended to meet the requirements of Section 4975(e)(7) of the Internal Revenue Code (the "Code") and IRS Regulations § 54.4975-11. The written instrument, within the meaning of ERISA § 402, 29 U.S.C. §1102, by which the Plan is maintained is the Rainbow Disposal Co., Inc. Employee Stock Ownership Plan (the "Plan Document"), as amended and restated effective as of July 1, 2004. The Rainbow ESOP Plan Document has been amended several times since July 1, 2004, including most recently by Amendment No. 5 on October 1, 2014. The Rainbow ESOP Plan Document has not been restated since July 1, 2004.  The Rainbow ESOP is named as a nominal defendant pursuant to Rule 19 to ensure that complete relief can be granted as to claims brought on behalf of the Rainbow ESOP.

## OTHER RELEVANT NON-PARTIES

27.     Rainbow Disposal Co. Inc. is and has been a California corporation with its principal place of business located in Huntington Beach, California. As of October 1, 2014, Rainbow Disposal is a wholly-owned subsidiary of Republic Services. Rainbow Disposal is the plan sponsor, as defined in ERISA § 3(16)(B), 29 U.S.C § 1002(16)(B) of the Rainbow ESOP.

28.     Bruce Shuman was the Chief Executive Officer for Rainbow Disposal. Shuman was a member of the Administrative Committee from at least July 2007 until his termination from Rainbow Disposal in September 2013.

29.     Jeff Feltch was the Chief Financial Officer for Rainbow Disposal between at least February 3, 2014 and October 1, 2014 according to the Statement of Information filed by Rainbow Disposal with the State of California Secretary of State.

## CLASS ACTION ALLEGATIONS

30.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf the following persons Class:

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK OWNERSHIP PLAN COMMITTEE et al.,* COMPLAINT - 10

1  All persons who were vested participants in the Rainbow ESOP as of
2  October 1, 2014 and the beneficiaries of any such participants.

3  31.   Excluded from the Class are Defendants and persons who were named
4  fiduciaries of the Rainbow ESOP, who are alleged to have engaged in prohibited
5  transactions or breaches of corporate fiduciary duties, or who had decision-making
6  or administrative authority relating to the administration, modification, funding, or
7  interpretation of the Rainbow ESOP, or relating to the decision to sell Rainbow.

8  **Impracticability of Joinder**

9  32.   The members of the Class are so numerous that joinder of all
10  members is impracticable. According to a Form 5310 Rainbow Disposal filed with
11  the Internal Revenue Service ("IRS") on November 21, 2014, the ESOP had 460
12  participants at the time Republic Services acquired Rainbow Disposal.  Most, if not
13  all, of the ESOP participants likely had at least one beneficiary because every
14  married participant would have had at least one beneficiary and some participants
15  likely designated more than one beneficiary.  As such, the class consists of at least
16  several hundred persons.

17  **Commonality**

18  33.   The issues of liability are common to all members of the Class and are
19  capable of common answers as those issues primarily focus on Defendants' acts
20  (or failure to act).  The common issues include whether the fiduciary Defendants
21  breached various fiduciary duties to the Rainbow ESOP, whether Defendants
22  Moffatt, Snow and Range engaged in prohibited transactions, whether the fiduciary
23  defendants are liable for their co-fiduciaries breaches, whether Republic Services
24  knowingly participated in these breaches, whether the Rainbow ESOP suffered
25  losses as a result of the fiduciary breaches and other violations and what is the
26  appropriate relief for Defendants' violations of ERISA.

27
28

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK
OWNERSHIP PLAN COMMITTEE et al.,* COMPLAINT - 11

**Typicality**

34.    Plaintiffs' claims are typical of the claims of other members of the Class because their claims arise from the same event, practice and/or course of conduct. Specifically, Plaintiffs, on behalf of the Class, alleged that Defendants breached their fiduciaries or otherwise violated ERISA in connection with the sale of Rainbow Disposal to Republic Services, management of the assets of the Plan or in performing their fiduciary duties to the Plan.  Plaintiffs' claims are also typical of the claims of the Class because they generally seek recovery and relief on behalf of the Plan.

**Adequacy**

35.    Plaintiffs will fairly and adequately represent and protect the interests of the Class.

36.    Plaintiffs do not have any interests antagonistic to or in conflict with those of the Class.

37.    Defendants have no unique defenses against Plaintiffs that would interfere with Plaintiffs' representation of the Class.

38.    Plaintiffs are represented by counsel with extensive experience prosecuting class actions in general and ERISA class actions and particular experience and expertise in ESOP litigation.

**Fed. R. Civ. P 23(b)(1)(A)**

39.    The requirements of Fed. R. Civ. P 23(b)(1)(A) are satisfied. Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to act in the best interests of the Plan and their participants.  This action challenges whether Defendants acted consistently with their fiduciary duties or otherwise violated ERISA as to the Rainbow ESOP as a whole. As a result, prosecution of separate actions by individual members would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct relating to the Plan.

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK OWNERSHIP PLAN COMMITTEE et al.*, COMPLAINT - 12

1

**Fed. R. Civ. P 23(b)(1)(B)**

2      40.    The requirements of Fed. R. Civ. P. 23(b)(1)(B) are also satisfied.

3   Administration of an ERISA-covered plan requires that all similarly situated

4   participants be treated the same.  Resolving whether Defendants fulfilled their

5   fiduciary obligations to the Plans, engaged in prohibited transactions with respect

6   to the Plan or knowingly participated in such breaches or violations as to Plaintiffs'

7   claims would, as a practical matter, be dispositive of the interests of the other

8   participants in the Rainbow ESOP even if they are not parties to this litigation and

9   would substantially impair or impede their ability to protect their interests if they

10  are not made parties to this litigation by being included in the Class.

11     **Fed. R. Civ. P. 23(b)(2)**

12     41.    The requirements of Fed. R. Civ. P. 23(b)(2) are satisfied as to the

13  Class because Defendants have acted and/or failed to act on grounds generally

14  applicable to the Class, making declaratory and injunctive appropriate with respect

15  to the Class as a whole. This action challenges whether Defendants acted

16  consistently with their fiduciary duties or otherwise violated ERISA as to the

17  Rainbow ESOP as a whole. The relief sought in this case primarily consists of

18  declarations that Defendants breached their fiduciary duties or engaged in other

19  violations of ERISA and injunctive relief.  As ERISA is based on trust law, any

20  monetary relief is consists of equitable monetary relief and is either provided

21  directly by the declaratory or injunctive relief or flows as a necessary consequence

22  of that relief.

23     **Fed. R. Civ. P 23(b)(3)**

24     42.    The requirements of Fed. R. Civ. P. 23(b)(3) are also satisfied.  The

25  common questions of law and fact concern whether Defendants breached their

26  fiduciary duties or violated ERISA to the Rainbow ESOP.  As the members of the

27  Class were participants in that Plan, their accounts were affected by those breaches

28  and violations.  Common questions related to liability will necessarily predominate

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK
OWNERSHIP PLAN COMMITTEE et al.,* COMPLAINT - 13

over any individual questions precisely because Defendants' duties and obligations were uniform to all participants and therefore all members of the Class.  As relief and any recovery will be on behalf of the Plan, common questions as to remedies will likewise predominate over any individual issues.

43.     A class action is a superior method to other available methods for the fair and efficient adjudication of this action.  As the claims generally are brought on behalf of the Plan, resolution of the issues in this litigation will be efficiently resolved in a single proceeding rather than multiple proceedings and each of those individual proceedings could seek recovery for the entire Plan.  Class certification is a superior method of proceeding because it will obviate the need for unduly duplicative litigation which might result inconsistent judgments about Defendants' duties with regard to the Rainbow ESOP.

44.     The following factors set forth in Rule 23(b)(3) also support certification:

a.     The members of the Class have an interest in a unitary adjudication of the issues presented in this action for the reasons that this case should be certified under Rule 23(b)(1).

b.     No other litigation concerning this controversy has been filed by any other members of the Class

c.     This District is the most desirable location for concentrating this litigation because (i) Rainbow Disposal is located in this District; (ii) the Rainbow ESOP was administered in this District at least until October 1, 2014, (iii) the majority of the participant class members are located in this District, and (iv) a number of the witnesses, including a number of relevant non-party witnesses, are expected to be located in this District.
There are no anticipated difficulties in managing this case as a class action.

## FACTUAL ALLEGATIONS

### Background of Rainbow Disposal

45.     Rainbow Disposal Co. Inc. was formed in 1970 by Henry Hohnstein, Philip Hohnstein and Paul Loumena under the Corporation Code of the State of California. Pursuant to its Articles of Incorporation filed January 19, 1970, Rainbow "primarily to engage" in "the picking up, transporting and disposing of trash and rubbish materials from residential, commercial and income properties." From 1970 until at least October 1, 2014, the principal office of Rainbow have been located in Orange County, California. By 2004 and through at least 2014, Rainbow became and was one of the largest Southern California waste disposal and recycling companies.

### Rainbow Disposal Establishes the Rainbow ESOP

46.     According to Section 1 of the Plan Document Rainbow Disposal established the Rainbow ESOP as of July 1, 1995.  The Plan Document was amended and restated as of July 1, 1999 and as of July 1, 2004.  The Plan Document has been amended several times, but has not been restated since 2004.

47.     According to the 2007 Form 5500, there were $3,716,525.1921 shares allocated to participant accounts in the Rainbow ESOP as of June 30, 2004.  As of June 30, 2004, the ESOP purchased 1,600,176 Class A common stock of the Company at $15.61 per share for a total price of $24,977,747.36.  The Plan borrowed the entire purchase price, $24,977,747.36, from Rainbow Disposal under a loan agreement that is collaterized by the Class A common stock.

48.     According to the Form 5500s (which are the annual report and financial statements for employee benefit plans filed under penalty of perjury with the Department of Labor and Department of Treasury), the Rainbow ESOP purchased all Rainbow Disposal stock in leveraged ESOP transactions.  Rainbow Disposal loaned those funds to the ESOP, which the ESOP used to finance its purchase of Rainbow Disposal stock.  It is not clear whether Rainbow Disposal

also borrowed the funds to loan to the ESOP, but if so, as Rainbow Disposal makes contributions to the ESOP, the Rainbow ESOP makes payments on its loan with Rainbow Disposal, Rainbow Disposal makes payments on its loan with the private lender.

49.     As explained and as provided Section 5(b) of the Plan Document, the Rainbow shares in the ESOP that serve as collateral on the loan are held in a separate Loan Suspense Account.  Section 5(b) of the Plan Document specifically provides that no other Trust Assets, including shares that have been allocated by participants may be pledged as collateral for an Acquisition Loan.  Section 5(b) of the Plan Document also requires that as payments are made on the loan by the Trustee, any Financed Shares must released from the Loan Suspense Account and distributed to ESOP participants' accounts.  Once those shares have been released to Participant Accounts, those accounts no longer serve as collateral for the acquisition loan.

50.     According to the Form 5500s, the assets of the Rainbow ESOP have predominantly been composed of Rainbow Disposal stock. As explained in the Section 6 of the Plan Document, ESOP Participants each have two accounts in the trust: a Company Stock Account and an Other Investments Account. Company stock is allocated to individual participants' Company Stock Accounts as they accrue shares, which the ESOP states is based on a ratio of each participant's compensation to the total compensation of all such participants. Participants also share in the net income or loss of the Trust, which includes the increase or decrease in the fair market value of Company Stock and any ESOP expenses. Any increase or decrease in stock is accounted for in a participant's Other Investments Account. As a result, an increase or decrease in Rainbow Disposal's performance during any given year will directly affect the ESOP's participants by increasing or decreasing the value of Rainbow Disposal stock held in their accounts.

**Rainbow's Articles of Incorporation Required Employee Ownership**

51.     Rainbow Disposal's Articles of Incorporation were properly amended on February 12, 1999 and filed with the Secretary of State of California on February 18, 1999. Among the changes to Rainbow Disposal's Articles of Incorporation in February 1999 was to add an Eighth Article which required that Rainbow Disposal must be owned by its employees as follows:

> EIGHTH. Substantially all of the outstanding shares of capital stock of the Corporation shall at all times be owned by: (a) employees of the Corporation (or of a subsidiary of the Corporation); (b) any trust with respect to which an employee of the Corporation (or of a subsidiary of the Corporation) is treated as the owner of such shares for federal income tax purposes; (c) the Corporation's Employee Stock Ownership Plan and Trust; and/or (d) individuals or entities receiving such shares as a benefit distribution pursuant to the provisions of the Corporation's Employee Stock Ownership Plan and Trust (provided that such individuals or entities must immediately resell such shares to the Corporation). The Corporation shall enter into such agreements containing restrictions on subsequent transfer of such shares and other provisions as may be necessary or appropriate to ensure compliance with this Article EIGHTH.

52.     Rainbow Disposal's Restated Articles of Incorporation were properly amended on June 24, 2004 and filed on filed with the Secretary of State of California on June 28, 2004. The June 2004 Amendment to Rainbow Disposal's Restated Articles of Incorporation included an Eighth Article to require that Rainbow Disposal must be owned by its employees as follows:

> EIGHTH. Substantially all of the outstanding shares of capital stock of the Corporation shall at all times be owned by: (a) employees of the Corporation (or a subsidiary of the Corporation); (b) any trust,

1
2
3
4
5
6
7
8
9
10
11
12

*partnership or limited liability company* with respect to which an employee of the Corporation (or a subsidiary of the Corporation) is treated as the owner of such shares for federal income tax purposes; (c) the Corporation's Employee Stock Ownership Plan and Trust; and/or (d) individuals or entities receiving such shares as a benefit distribution pursuant to the provisions of the Corporation's Employee Stock Ownership Plan and Trust (provided that such individuals or entities must immediately resell such shares to the Corporation). The Corporation shall enter into such agreements containing restrictions on subsequent transfer of such shares and other provisions as may be necessary or appropriate to ensure compliance with this Article EIGHTH.

13   (italics indicating the changes)

14   53.   The Eighth Article of Rainbow Disposal's Articles of Incorporation,
15   which required that ownership of Rainbow Disposal be limited to its employees
16   directly or indirectly (e.g. through a trust or the Rainbow ESOP), remained
17   unchanged and in full force and effect on and after October 1, 2014, the date on
18   which the Rainbow ESOP was sold to Republic.  Contrary to the Eighth Article,
19   the sale on October 1, 2014 purported to divest Rainbow employees and the ESOP
20   of ownership of Rainbow.  Prior to the October 1, 2014 sale, there was no vote by
21   the Board to amend the Articles of Incorporation nor, more importantly, any vote
22   by either the shareholders of Rainbow Disposal nor any vote by participants of the
23   Rainbow ESOP to amend the Articles of Incorporation.

24   **Rainbow Disposal After the 2004 ESOP Transaction**

25   54.   Prior to June 30, 2004, James Brownell and Stanley Tkaczk were the
26   Co-Presidents of Rainbow Disposal and Bruce Shuman was the Secretary.

27
28

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK OWNERSHIP PLAN COMMITTEE et al.*, COMPLAINT - 18

55.     Sometime after the June 30, 2004 ESOP Transaction, Rainbow Disposal came under new management, except for Bruce Shuman who remained as CEO and Secretary of the company until he left in 2013.

56.     As a result of the June 30, 2004 ESOP Transaction, Rainbow owned 100% of the outstanding shares of Rainbow stock.

57.     As reflected in the Benefits Payments and Withdrawals section in the Notes to Financial Statements of the Form 5500s between 2006 and 2010, the per share value of Rainbow Disposal's stock was as follows:

2006: $9.19 per share

2007: $9.47 per share

2008: $11.21 per share

2009: $8.44 per share

2010: $10.77 per share

2011: $11.43 per share

**Rainbow Directors & Officers Shuman and Moffatt Use Rainbow Disposal Assets to Pursue Their Own Financial Gain**

58.     By 2009 Rainbow Disposal was under the management of Defendants Moffatt and Snow, as well as Bruce Shuman.  At approximately that time, Moffat and Shuman if not also Snow began to have Rainbow Disposal expand into other geographic areas outside its core business areas.  Among other ventures, Rainbow Disposal formed certain subsidiaries including Southeast Renewables, West Florida Recycling, Agromin and a venture in New Mexico.

Southeast Renewables

59.     In early 2010, Shuman and Moffatt formed a LLC called Southeast Renewables, LLC ("Southeast Renewables"). Southeast Renewables was incorporated on March 25, 2010, and formed to construct, own, and operate solid waste recycling facilities and/or waste-to-energy facilities, including material recovery facilities, transfer stations, refuse collection operations, recycling

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK OWNERSHIP PLAN COMMITTEE et al.,* COMPLAINT - 19

1 | operations, and transfer operations in the southeastern United States. These are the
2 | same business activities in which Defendant Rainbow engages. According to Larry
3 | Hoover and the deposition of Moffatt in other litigation, Rainbow owned 25
4 | percent of Southeast Renewables.

5 | 60. According to his deposition, Shuman was an accountant by education
6 | and training. According to Larry Hoover, Shuman obtained a 12 to 12.5 percent
7 | ownership interest in Southeast Renewables. In exchange for his ownership
8 | interest, he provided no capital and instead only provided recycling and waste-to-
9 | energy expertise – the same skills and expertise that he developed, was
10 | compensated for, and that he utilized in his employment with Rainbow Disposal.

11 | 61. According to Larry Hoover, Defendant Moffatt also obtained a 12 to
12 | 12.5 percent of Southeast Renewables starting beginning in 2010. In exchange for
13 | his ownership interest, he provided no capital and instead provided facilities
14 | management – the same skills that he developed, was compensated for, and that he
15 | was supposed to be utilizing in his employment with Rainbow Disposal. As Mr.
16 | Moffat explained in a deposition in other litigation, he "did not provide any capital
17 | to Southeast Renewables. The only thing that [he] provided [was] knowledge."

18 | 62. As Mr. Shuman and Mr. Moffat were already obligated as officers and
19 | directors of Rainbow Disposal to provide those skills to Rainbow Disposal, there
20 | was no legitimate reason why they should have been provided an ownership
21 | interest.

22 | 63. According to a deposition of Mr. Moffat in other litigation, Moffatt
23 | and Shuman obligated Rainbow Disposal to provide capital and operational
24 | expertise in exchange for a 25 percent interest. Rainbow Disposal was the sole
25 | member of the LLC to provide capital for the venture.

26 | 64. According to his deposition in other litigation, Mr. Moffat ceased
27 | being an owner of Southeast in 2013 because he did not want the liability. Bruce
28 | Shuman also ceased being an owner at approximately the same time.

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK*
*OWNERSHIP PLAN COMMITTEE et al.*, COMPLAINT - 20

1

<u>West Florida Recycling</u>

2    65.    As set forth in the Application by Foreign Limited Liability Company

3 for Authorization to Transact Business in Florida filed with the Florida Secretary

4 of State, Defendants Moffatt and Shuman caused Rainbow Disposal to form West

5 Florida Recycling in May 2010 and were both managers or managing members of

6 West Florida Recycling.  Rainbow Disposal owned 55% of West Florida

7 Recycling. As with SER, Rainbow contributed financial capital for West Florida

8 Recycling and neither Moffat nor Shuman invested any significant financial capital

9 in West Florida Recycling.

10    66.    According to Larry Hoover, Rainbow Disposal worked jointly with

11 Southeastern Renewables on many projects in southern Alabama and the north-

12 western part of Florida.

13    67.    According to annual reports filed with the Florida Secretary of State,

14 Larry Hoover, a 26 percent owner in Southeastern Renewables, was the manager

15 of West Florida Recycling and received $30,000 per month in compensation.

16    68.    During the time that Rainbow Disposal was an owner, West Florida

17 Recycling never made a profit.  During the time that Rainbow owned West Florida

18 Recycling it lost an average of $50,000 to $100,000 per month.

19    69.    According to a July 31, 2013 letter from the Florida Department of

20 Environmental Protection, West Florida Recycling was warned of possible

21 violations of Chapter 403, Florida Statutes and Chapters 62-620 and 62-621,

22 Florida Administrative Code following a National Pollutant Discharge Elimination

23 System Stormwater inspection. The Florida Fish and Wildlife Conservation

24 Commission found West Florida Recycling was dumping the waste on commercial

25 and residential lots in a neighboring city although customers had paid the company

26 to pick up and recycle their waste.

27

28

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK*
*OWNERSHIP PLAN COMMITTEE et al.,* COMPLAINT - 21

70.     According to a letter from Shuman dated April 8, 2013, Southeastern Renewables purchased West Florida Recycling. Less than a year later, West Florida Recycling filed for bankruptcy on March 31, 2014.

71.     Rainbow Disposal is listed as a creditor on the petition for bankruptcy by West Florida Recycling. Rainbow Disposal incurred losses from this deal because Rainbow Disposal lost the $6-to-8 million of capital it had contributed to establish West Florida Recycling.  These losses also resulted in decreases to the value of the Rainbow stock held by the Rainbow ESOP.

**Rainbow Disposal's Stock Value 2012-2014**

72.     As a result of its investments in Southeastern and West Florida Recycling and other non-core subsidiary businesses, during 2012 or 2013 Rainbow Disposal began to default on its loan covenants, according to a deposition of Mr. Shuman in other litigation.  According to the depositions of Mr. Moffat and Mr. Shuman in other litigation, one of Rainbow Disposal's lenders, Bank of America, gave Rainbow Disposal a directive, in May 2013, to cease funding to all subsidiaries that were not in Huntington Beach, California.

73.     In 2012 and 2013, the value of Rainbow Disposal stock decreased dramatically from $11.43 per share in 2011 to $7.48 per share in 2012 and then further reduced to $6.71 per share by 2013. The decline in Rainbow Disposal's stock value coincided with and upon information and belief, was caused at least by Rainbow Disposal's investments in SER and WFR.

74.     Based on statements made by Jeff Feltch to Rainbow employees in June 2014, Rainbow Disposal "got killed on West Florida" and also incurred significant losses in New Mexico as well.

75.     According to statements made by Jeff Feltch in July 2014, the "Florida stuff" (meaning Southeast Renewables and West Florida Recycling) caused the financial problems of Rainbow Disposal.  Those investments caused distractions from the core business of Rainbow Disposal, required Rainbow

Disposal to restructure and caused Rainbow's bankers to have concern because the banks "felt they were lied to."

76.     Despite these losses (for which Rainbow Disposal did not recover), by June 30, 2014, Rainbow Disposal stock was valued at $16.67 per share according to the 2013 Form 5500 filed with the Department of Labor on April 15, 2015.  Had Rainbow Disposal not incurred these losses or recovered these losses, its stock price would have been higher.

77.     The Rainbow ESOP's investment in company stock represented 97 of the Plan's assets. The 2013 Form 5500 reported that as of June 30, 2014, the 3,536,952 shares allocated to participants' ESOP accounts had a reported value of $58,960,998 (or $16.67 per share) and the 136,668 unallocated shares had a value of $2,278,252 (or $16.67 per share) despite being the only shares serving as collateral for the debt; however, that amount improperly attributes the debt to *all* shares rather than just the unallocated shares, which were the only shares that served as collateral for the debt.  As such, the allocated shares should have been valued higher.

78.     By June 30, 2014, there was only $4,683,302 outstanding on the ESOP loan, which was scheduled to be paid on the last day of each quarter, according to the 2013 Form 5500.

**RELEVANT PROVISIONS OF THE ESOP**

Definitions

79.     Section 2 of the Plan Document includes the following definitions:

| Committee | The Committee appointed by the Board of Directors to administer the Plan. |
|---|---|
| Fair Market Value | The fair market value of Company Stock, as determined by the Trustee for all purposes under the Plan based upon a valuation by an |

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK OWNERSHIP PLAN COMMITTEE et al.*, COMPLAINT - 23

| | |
|---|---|
| | independent appraiser (within the meaning of Section 401(a)(28)(C) of the Code). |
| Investment Manager | A person (1) registered as an investment adviser under the Investment Advisers Act of 1940, (2) a bank, or (3) an insurance company qualified to manage, acquire or dispose of Trust Assets under the laws of more than one state, who is appointed by the Committee pursuant to Section 402(c)(3) of ERISA to manage the investment of Trust Assets other than Company Stock, provided that such person acknowledges in writing that he is a fiduciary with respect to the Plan. |
| Trust Assets | The Company Stock (and any other asset held in Trust for the benefit of Participants as set forth in Section 5 of the Plan Document. |
| Trustee | Trustee or Trustees appointed by the Board of Directors of Rainbow Disposal Co., Inc. to serve as the trustee(s) of the Trust as set forth in Section 17 of the Plan Document. |

<u>Fiduciaries of the ESOP</u>

*The Rainbow ESOP Committee*

80.     Section 17(a) of the 2004 ESOP Plan Document provides that the Rainbow ESOP will be administered by a Committee composed of one or more individuals appointed by the Board of Directors.  Pursuant to Section 17(a) of the the members of the Committee are named fiduciaries with authority to control and manage the operation and administration of the Rainbow ESOP.  Once appointed, members of the Committee can only resign by providing notice, in writing, to the

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK OWNERSHIP PLAN COMMITTEE et al.,* COMPLAINT - 24

Board of Directors.  No documents have been provided to Plaintiffs evidencing that the Prior Committee Defendants properly resigned under the terms of the Plan.

81.  Section 17(b) of the 2004 Plan Document requires that any Committee action will be by a vote of a majority of the members at a meeting or by unanimous written consent without a meeting.  Section 17(b) also prohibits any member of the Committee from voting "on any matter relating specifically to himself."

82.  Section 17(b) of the 2004 Plan Document also requires the Committee to designate both a Chair and a Secretary.  Section 17(b) authorizes only the Chair or the Secretary to execute any certificate or other written direction on behalf of the Committee.

83.  Section 17(b) of the 2004 Plan Document requires that the Secretary of the Committee must keep a record of the Committee's proceedings and all dates, records and documents pertaining to the administration of the Plan.  No minutes of any meetings discussing the sale of stock by the Rainbow ESOP stock have been provided to Plaintiffs.

84.  Section 17(c) of the 2004 Plan Document provides that the Committee shall have all powers necessary to enable it to administer the Plan Document and Trust Agreement in accordance with the provisions of those documents, and specifically enumerates the following powers, among others:

      a.   authorizing and directing all disbursements of Trust Assets by the Trustee

      b.   engaging any administrative, legal, accounting, clerical or other services that it may deem appropriate

      c.   reviewing the performance of the Trustee with respect to the Trustee's administrative duties, responsibilities and obligations under the Plan and Trust Agreement

*The Trustee*

85.     Section 17(c) of the 2004 Plan Document provided that the Committee was responsible for directing the Trustee as to the investment of Trust Assets.   Section 17(c) permitted the Committee to delegate to the Trustee the responsibility for investing all or any portion of the Trust Assets; however, Section 17(c) required that the Committee establish a funding policy and method for directing the Trustee to acquire Company Stock and for otherwise investing the Trust Assets in a manner that is consistent with the objections of the Plan and the objectives of the Plan and requirements of ERISA.   In response to Plaintiffs' request for documents pursuant to ERISA, no such funding policy or investment policy has been provided.

*The Investment Manager*

86.     Section 17(c) of the 2004 Plan Document provided that the Committee may delegate to an Investment Manager the responsibility for investing Trust Assets other than Company Stock.   Between at least 2014 and the present, there was no Investment Manager, within the meaning of Section 2 of the ESOP Plan Document, appointed for the Rainbow ESOP.

*Delegation of Powers*

87.     In the event that there was an allocation or delegation of any the rights, powers, duties, and responsibilities of the Committee to any other person (including the Trustee or any subset of the Committee) that allocation or delegation was required pursuant to Section 17(f) of the Plan Document to be made in writing. In addition, Section 17(f) of the Plan Document required that the allocation and delegation "be reviewed periodically by the Committee" and any such allocation or delegation be terminable by the Committee in the Committee's discretion.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Investment of the Assets of the Plan

88.    Section 5(a) of the Plan Document both before and after October 1, 2014 required that Trust Assets will be invested by the Trustee primarily (or exclusively) in Company Stock in accordance with directions from the Committee.

89.    Section 5(a) of the Plan Document both before and after October 1, 2014 requires the Trustee to "invest any Trust Assets that are not invested in Company Stock in such prudent investments as the Committee deems to be desirable for the Trust."   Section 5(a) only allows Trust Assets to be held "temporarily in cash."

Sale of Company Stock Must Be For Fair Market Value

90.    Section 5(d) of the 2004 Plan Document governs the sale of the Rainbow Stock held by the Rainbow ESOP.  Prior to August 25, 2014, Section 5(d) provided that "[s]ubject to the approval of the Board of Directors, the Committee may direct the Trustee to sell shares of Company Stock to any person (including the Company), provided that any such sale must be made at a price not less than Fair Market Value *as of the date of the sale*." (emphasis added)

91.    On August 25, 2014, Gerald Moffatt executed Amendment No. 4 of the Plan which purported to be retroactive to August 8, 2014. Amendment No. 4 modified the language in Section 5(d), entitled Sales of Company Stock, to add the following paragraph:

> Notwithstanding the foregoing provisions or any other provision in the Plan or Trust to the contrary, the Trustee shall have the discretionary authority (without directions from the ESOP Committee, the Board of Directors or any other party) to: (i) sell all or substantially all of the outstanding shares of the Company to a third party in a change of control transaction, and (ii) execute and deliver instruments to effect such a sale.

Nothing in this additional language modified the requirement that any such sale must be made at a price not less than Fair Market Value *as of the date of the sale*."

92.     Both before and after August 25, 2014 (at least until the Closing on October 1, 2014), Section 5(d) required that any "decision to sell Company Stock under this Section 5(d) must comply with the fiduciary duties applicable under Section 404(a)(1) of ERISA and with the primary benefit rule of Section 408(b)(3)(A) of ERISA and Section 4975(d)(3)(A) of the Code."

93.     Section 2 of the ESOP defines "Fair Market Value" as the "fair market value of Company Stock, as determined by the Trustee for all purposes under the Plan based upon a valuation by an independent appraiser (within the meaning of Section 401(a)(28)(C) of the Code."

94.     IRC § 401(a)(28)(C) requires that "all valuations of employer securities which are not readily tradable on an established securities market with respect to activities carried on by the plan are by an independent appraiser" which means an appraiser meeting the requirements of the regulations prescribed under section 170(a)(1).

95.     Rainbow stock was not readily tradeable on an established securities market.

Voting

96.     Section 8 of the 2004 Plan document provides Plan participants voting rights with respect to corporate matters as follows:

> With respect to any corporate matter which involves the voting of such shares at a shareholder meeting and which constitutes a merger, consolidation, recapitalization, reclassification, liquidation, dissolution, or the sale of substantially all the assets of a trade or business or a similar transaction specified in the regulations under Section 409(e)(3) of the Code . . . each Participant (or Beneficiary)

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK OWNERSHIP PLAN COMMITTEE et al.*, COMPLAINT - 28

will be entitled to give confidential instructions as to the voting of shares of Company Stock then allocated in his Company Stock Account. In that event, each Participant (or Beneficiary) shall be provided with the information statement and other materials provided to Company shareholders in connection with each shareholder meeting, together with a form upon which confidential voting instructions may be given to the Trustee. The trustee shall vote shares of allocated Company Stock as directed by Participants (or Beneficiaries) and shall not disclose the confidential voting directions of any individual Participant (or Beneficiary) to the Company, an Employer or the Committee.

97.     The March 2009 SPD, which was the one in effect prior to the October, 1, 2014, sale explains as follows: "The committee usually decides how shares of Company Stock held by the ESOP will be voted. *In certain important corporate matters however, such as a merger or liquidation of the Company, you may have the right to decide how shares of Company Stock allocated to your Company Stock Account will be voted.*" (emphasis added).

98.     The notes to the financial statements to the Forms 5550 filed with the Department of Labor between at least 2009 and 2014 describe the voting provision in the Plan Document as follows: "Each participant is entitled to exercise voting rights attributable to the shares allocated to his or her account."

Administrative Expenses

99.     Section 17(d) of the Plan Document allows only "reasonable expenses of administering the Plan and Trust [to] be charged to and paid out of the Trust Assets. The Company may, however, pay all or any portion of such expenses directly, and payment of expenses by the Company shall not be deemed to be Employer Contributions."

100.   Section 6(c) of the 2004 Plan document provides that each participant's Other Investment Account will be "reduced by any expenses charged to the Trust Assets for that Plan Year." Thus, expenses charged to Trust Assets are passed on to and paid for by each Participant or Beneficiary.

**GreatBanc Is Hired as the Trustee**

101.   GreatBanc was hired as the successor Trustee of the Rainbow ESOP pursuant to a Successor Trust Agreement dated October 7, 2002.  GreatBanc has acted as the sole Trustee of the ESOP since the Board of Directors of Rainbow appointed GreatBanc as the Trustee on October 11, 2002.

102.   Section 14 of the October 7, 2002 Successor Trustee Engagement Agreement between GreatBanc and Rainbow Disposal purports to disclaim any responsibility by GreatBanc to pay for "any loss, cost, expense, or other damage, including attorneys' fees suffered by any of the Indemnitees [defined as GreatBanc and its officers, directors, employees, and agents] resulting from or incurred with respect to any legal proceedings related in any way to the performance of services by any one or more of the Indemnitees." Subsection (b) of Section 15, requires Rainbow Disposal to "reimburse the Indemnitees for all reasonable costs that they incur in connection with any Proceeding."

103.   Section 17 of the Successor Trustee Engagement Agreement provides, "[i]f a court of competent jurisdiction shall hold that any payment or award of indemnification pursuant to the terms of this Agreement shall be unavailable to any one or more of the Indemnitees from the Company for any reason other than their gross negligence or willful misconduct, the Company then shall reimburse the affected Indemnitees, as required by Section 14, but taking into account the basis for the denial of full indemnification by the court."

**Relevant Sections of the Trust Agreement**

104.   The operative Trust Agreement is entitled "Rainbow Disposal Co. Inc. Employee Stock Ownership Trust Agreement As Amended and Restated Effective

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK OWNERSHIP PLAN COMMITTEE et al.,* COMPLAINT - 30

1  as of January 1, 1999." Since 1999, there have been three amendments to that
2  Agreement, but the Trust Agreement has not been restated.

3      105.   Paragraph A of the Trust Agreement requires that the assets of the
4  Trust be held in trust by the Trustee. Paragraph A also specifies that, except as
5  provided in Paragraphs B(3) and B(6), the Trust Assets will be invested by the
6  Trustee as directed by the Committee (appointed to administer the Plan) pursuant
7  to the terms of the Plan and the Trust Agreement. Paragraph A also provides that
8  the Trustee will "hold, invest, reinvest, manage, administer and distribute the Trust
9  Assets as directed by the Committee."

10     106.   Paragraph B of the Trust Agreement also provides that the following
11 of the Trustee's actions will be as directed by the Committee: (1) investment and
12 reinvestment of Trust Assets in Company Stock; (2) investment of Trust Assets in
13 other investments, but also provides that Trust Assets may only "be held
14 *temporarily* in cash." Paragraph B(3) of the Trust Agreement provides that the
15 Committee will have responsibility and liability for the prudence of investments
16 directed by the Committee under Paragraph B.

17     107.   Paragraph B(6) of the Trust Agreement provides that the Rainbow
18 Board may engage the Trustee in writing to act on any matter (without direction
19 from the Committee based upon the Trustee's determination that the terms of the
20 transaction are fair and reasonable and in the best interests of Participants and in
21 compliance with all applicable provisions of the IRC and ERISA.

22     108.   Paragraph C of the Trust Agreement provides that "as directed by the
23 Committee," the Trustee will have the following powers among others:

24         (1)    enter into transactions to acquire or sell stock
25         (2)    vote any stocks (including Company Stock, but only as
26         provided in Section 8 of the Plan);
27         (8)    "sue, defend, compromise, arbitrate or settle any suit or legal
28         proceeding or any claim due it on which it may be liable;"

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK*
*OWNERSHIP PLAN COMMITTEE et al.,* COMPLAINT - 31

(9)    "exercise any powers of an owner with respect to Company Stock and other Trust Assets;"

(10)   employ agents, legal counsel, independent appraisers, actuaries, or other persons.

109.   Paragraph J of the Trust Agreement purports to disclaim any liability for the Trustee for action the Trustee takes or refrains from taking based on proper direction from the Committee.  Paragraph J includes an indemnification provision, but exempts breaches of fiduciary duty under ERISA.

110.   Paragraph K of the Trust Agreement provides that "the Company (through its Board of Directors)" has the ability to modify the Trust Agreement, but that any amendment altering the Trustee's duties, powers or liabilities must be done only with the Trustee's written consent.

111.   Paragraph M of the Trust Agreement provides that the Trustee may be removed by the Company and that the Board of Directors will appoint a successor trustee.

112.   Amendment No. 2 to the Trust Agreement purports to amend the Trust "effective as of July 1, 2014 by adding the following sentence to the end of Paragraph B" of the Trust Agreement:

Notwithstanding the foregoing provisions or any other provision in the Plan or Trust to the contrary, the Trustee shall have the discretionary authority (without directions from the ESOP Committee, the Board of Directors or any other party) to: (i) sell all or substantially all of the outstanding shares of the Company to a third party in a change of control transaction, and (ii) execute and deliver instruments to effect such a sale.

Amendment No. 2 has one signature, which appears to be Mr. Moffat's but does not indicate when it was signed.  Nothing in Amendment No. 2 states that the

amendment has been approved by the Board of Directors as required by Paragraph K of the Trust Agreement in order to make the amendment effective.

**GreatBanc's Settlement Agreement with the Department of Labor**

113.   The Department of Labor has instituted a number of lawsuits against GreatBanc, at least as far back as 2006 in *Chao v. Hagemeyer North America, Inc.*, No. 06-cv-01173 (D.S.C.), alleging that GreatBanc breached its fiduciary duties or otherwise violated ERISA in connection with transactions involving employee stock ownership plans owning privately held or closely held employer stock.

114.   In 2012, the Department of Labor filed litigation against GreatBanc concerning its role in the purchase of Sierra Aluminum Company stock by the Sierra Aluminum Company Employee Stock Ownership Plan, entitled *Perez v. GreatBanc Trust Company*, No. 5:12-cv-01648-R-DTB (C.D. Cal.).  In the lawsuit, the Department of Labor alleged that GreatBanc (a) failed to adequately inquire into an appraisal that presented unrealistic and aggressively optimistic projections of Sierra Aluminum's future earnings and profitability, (b) failed to investigate the credibility of the assumptions, factual bases and adjustments to financial statements that went into the appraisal and (c) asked for a revised valuation opinion in order to reconcile the ESOP's higher purchase price with the lower fair market value of the company stock.

115.   In a settlement agreement filed June 6, 2014 in *Perez v. GreatBanc Trust Company*, No. 5:12-cv-01648-R-DTB (C.D. Cal.) (Dkt No. 166-1), GreatBanc agreed to pay over $4.7 million to the Sierra ESOP plus $477,273 in fines to the U.S. Department of Labor.  Most significantly, and as many in the ESOP "industry" have noted, as part of the settlement agreement, GreatBanc was required to implement very specific policies and procedures whenever it serves as a trustee or other fiduciary of an ESOP in connection with transactions in which the ESOP is purchasing or selling, is contemplating purchasing or selling, or

receives an offer to purchase or sell employer securities that are not publicly traded.

116.    As then U.S. Secretary of Labor Thomas E. Perez observed in the Department of Labor press release announcing the settlement, the "more important[]" part of the settlement was to ensure "safeguards will be put in place to protect ESOPs involved in any future GreatBanc transactions."

117.    Attachment A to the Settlement in *Perez v. GreatBanc Trust Co.*, entitled "AGREEMENT CONCERNING FIDUCIARY ENGAGEMENTS AND PROCESS REQUIREMENTS FOR EMPLOYER STOCK TRANSACTIONS" consists of a 10-page set of very detailed and highly proscriptive policies that GreatBanc is required to implement whenever it serves as a trustee of an ESOP and is considering the purchase or sale of employer securities that are not publicly traded. These policies and procedures are summarized as follows:

a.    **Selection and Use of Valuation Advisor.**

i.    GreatBanc is required to hire a qualified valuation advisor, investigate the advisor's qualifications, and prudently determine that it can rely on the advisor *before* entering into the transaction.

ii.    GreatBanc cannot use an advisor for a transaction which has previously performed work for the ESOP sponsor (distinguished from the ESOP), any counterparty to the ESOP involved in the transaction, or any other entity that is structuring the transaction (such as an investment bank).

iii.    GreatBanc is prohibited from using an advisor that has a familial or corporate relationship to itself and other transaction parties.

iv.    In selecting an advisor for a transaction involving the purchase or sale of employer securities, GreatBanc has to prepare

a *written* analysis addressing specified topics such as the reason for selecting the particular advisor.

      v.      GreatBanc has to oversee the valuation process and make sure the advisor documents certain required items; if the advisor does not do so, GreatBanc then has to prepare supplemental documentation addressing a number of matters relating to the analysis.

      b.      **Financial Statements.**

      i.      GreatBanc must request that the company provide GreatBanc and its valuation advisor with audited unqualified financial statements prepared by a CPA for the preceding five fiscal years, unless financial statements extending back five years are unavailable.

      ii.      In the absence of such audited financial statements, GreatBanc is required to take certain steps before proceeding with the transaction, including additional documentation of why it has chosen to proceed.

      c.      **Fiduciary Review Process.**

      i.      GreatBanc must follow a specified process and document the valuation analysis that includes (a) determine the prudence of relying on the financial statements, (b) critically assess the reasonableness of any projections, and (c) document the basis for its conclusion that the information provided was current, complete and accurate.

      ii.      GreatBanc must document its analysis of the valuation report in writing by assessing 16 specific items.

      iii.      GreatBanc must document that its personnel have (a) read and understand the report, (b) identify and question the reports assumptions, (c) make reasonable inquiry about whether the information is consistent with information in the GreatBanc's

possession, (d) analyze whether the report's conclusions are consistent with the data and analysis and (e) analyze whether the report is internally consistent.

iv.     If the valuation report does not meet these criteria, then GreatBanc must not proceed with the transaction.

d.     **Fair Market Value.**  GreatBanc specifically agreed that it would not cause an ESOP to purchase employer securities for more than their fair market value or sell employer securities for less than their fair market value.

118.   Given the publicity of the GreatBanc-DOL Settlement Agreement at least within the ESOP community, the Prior ESOP Committee Defendants should have known about this Settlement.  Given the attention that this settlement received from the firms that regularly perform valuations for ESOPs, Defendant Range must have been aware of this settlement.  As a member of the Board of Directors of Rainbow and as such a fiduciary of the Rainbow ESOP, Defendant Range would have had a fiduciary duty to communicate such information to his fellow members of the Board as well as to the members of the Rainbow ESOP Committee. In addition, GreatBanc would have had a fiduciary duty as the Trustee to provide this information, if not the settlement agreement itself, to the ESOP Committee and to the Rainbow Board of Directors.  As such, the Prior ESOP Committee Defendants and the Board should have been aware of this Agreement.

**GreatBanc's Trustee Engagement Letter is Modified**

119.   A little over a month after the DOL's unique and comprehensive settlement with GreatBanc, on July 10, 2014, Defendant Moffat on behalf of Rainbow and the Rainbow ESOP enter into an Amendment to the Trustee Engagement Agreement with Great Banc. Section 2 of the Plan Document requires the Trustee to be appointed by the Rainbow Disposal Board of Directors, but

1   neither the Amendment nor any other document provided to Plaintiffs recites that

2   the Board had authorized the Trustee to have expanded authority on July 10, 2014.

3        120.   The July 10, 2014 Amendment to the Trustee Engagement Agreement

4   recites that the Amendment is being made to Original Engagement Agreement for

5   GreatBanc to "review a proposed transaction involving a sale of all of the issued

6   and outstanding stock of the Company to Republic Services." By the time of this

7   Amended Trustee Engagement Agreement, a proposed buyer had been selected

8   and the terms of a sale had already been proposed if not negotiated.

9        121.   From July 10, 2014 to at least until August 25, 2014, GreatBanc as the

10  Trustee did not have authority, without direction of the Committee to make

11  decisions pursuant to Section 5(a) of the Plan Document regarding the investment

12  of Plan assets in Company Stock.  Unless authorized by the Board of Directors as

13  provided by the Plan Document, GreatBanc did not have such authority.

14  **The Plan Document Is Amended & A Stock Purchase Agreement is Executed**

15       122.   On August 25, 2014, Gerald Moffatt executed Amendment No. 4 of

16  the Plan which purported to be retroactive to August 8, 2014. Amendment No. 4

17  modified the language in Section 5(d), entitled Sales of Company Stock, to add the

18  following paragraph:

19       Notwithstanding the foregoing provisions or any other provision in the

20       Plan or Trust to the contrary, the Trustee shall have the discretionary

21       authority (without directions from the ESOP Committee, the Board of

22       Directors or any other party) to: (i) sell all or substantially all of the

23       outstanding shares of the Company to a third party in a change of

24       control transaction, and (ii) execute and deliver instruments to effect

25       such a sale.

26       123.   Prior to Amendment No. 4, the Trustee did not have authority to sell

27  the Company stock held by the Rainbow ESOP under the terms of the Plan

28  Document except as directed by the Committee.

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK*
*OWNERSHIP PLAN COMMITTEE et al.,* COMPLAINT - 37

1   124.   The very next day after Amendment No. 4 was adopted, Republic

2   Services, the Rainbow ESOP and Rainbow Disposal entered into a Stock Purchase

3   Agreement dated August 26, 2014 setting forth that Republic would purchase all of

4   the outstanding company stock from the Rainbow ESOP contingent upon a closing

5   of the sale.  The Stock Purchase Agreement was described in the Unanimous

6   Written Consent of the Directors of Rainbow by Defendants Moffat, Snow and

7   Range "effective of October 1, 2014," was attached as an Exhibit thereto, but has

8   not been provided to Plaintiffs and was not provided to ESOP Participants.

9   **The Transaction Closes & The Plan Document Is Amended Again**

10   125.   Effective October 1, 2014, Republic acquired all of the shares of

11   Rainbow, either "for net proceeds of $50,829,073" according to the 2014 Form

12   5500 filed with the DOL on April 18, 2016" or "$48,815,131.29" according to both

13   the Form 5310 filed with the IRS on November 26, 2014 and according to the May

14   26, 2016 letter from the ESOP Committee. No explanation has been provided for

15   the discrepancy.  According to the 2014 Form 5500, in addition to the net

16   proceeds, $16,800,000 was placed into an escrow account pursuant to a "holdback

17   arrangement" whereby the proceeds were "scheduled to be disbursed

18   approximately equally over the 36-month period ending October 1, 2017."

19   126.   According to the 2014 Form 5500, the Plan Document was amended

20   "pursuant to the Stock Purchase Agreement."  On October 1, 2014, Defendant

21   Moffatt executed Amendment No. 5 of the Plan Document and Amendment No. 3

22   to the Trust Agreement.

23   **Amendment No. 5 to the Plan Document**

24   127.   Amendment No. 5 amended Section 1 of the Plan Document to

25   convert the plan from an ESOP to a Profit Sharing Plan and stated that the

26   following provisions were no longer effective among others: Section 2 definition

27   of Fair Market Value; Section 8 (Voting Company Stock).

28

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK
OWNERSHIP PLAN COMMITTEE et al.*, COMPLAINT - 38

128.    Amendment No. 5 amended Section 4 of the Plan Document to provide that a "final Employer Contribution shall be made to the Plan immediately prior to effective with the Closing to be used by the Trustee to repay the Acquisition Loan."  Amendment No. 5 also amended Section 6(a) of the Plan Document by adding the following verbiage, "Financed Shares released from the Loan Suspense Account as a result of [a final contribution by Rainbow Disposal] will be allocated as of the Closing among the Accounts of Participants."  Pursuant to Section 6 (b) of the 2004 Plan document and Sections 4 and 6(a) as amended by Amendment No. 5, all of the remaining shares that were being held in the Loan Suspense Account should have then been allocated to ESOP participants' accounts.

129.    Amendment No. 5 amended Section 5(d) of the Plan Document delete the first and last sentences and add that the Trustee had discretionary authority to enforce the provisions of the SPA "for the benefit of the Participants including decisions related to any payments of escrowed funds under the SPA."  Section 5(d) was also amended to expressly provide that the escrowed funds were "owned solely by Purchaser" and neither the Plan nor any participant or beneficiary had any interest in those funds and were not assets of the Plans until disbursed and received by the Trustee."  Thus, the amounts in Escrow were not held by the Trustee and were not listed as the assets on the Form 5500s.

130.    Amendment No. 5 also amended Section 5(d) to provide that "after Closing, Trust Assets will be invested primarily in investments designed to preserve principal consistent with the requirements of ERISA."

131.    Amendment No. 5 amended Article 20 to provide the following three distributions to Participants and Beneficiaries:

(i)    First, "[A]n initial distribution . . . offered in an amount equal to approximately 75% of all Participants' Account balances as of the closings;"

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK OWNERSHIP PLAN COMMITTEE et al.,* COMPLAINT - 39

(ii)    A second distribution "in cash in an amount equal to the remainder of all Participants' Account balances (*exclusive of* any amounts held in escrow under the SPA and *the amount set aside by the Trustee for Plan and Trust related expenses, such amounts to be determined at the sole discretion of the Trustee*) under the Plan;

(iii)    A third distribution that is described only as follows:

As soon as practicable following any distribution made to the Plan from the escrow created under the SPA (whether an annual distribution or the final distribution) the amounts shall be allocated and become available for distribution (exclusive of any amounts set aside by the Trustee for Plan and Trust related expenses, such amounts to be determined at the sole discretion of the Trustee).

No explanation or elucidation was provided as to conditions for the third distribution nor what expenses could be deducted from the second distribution.

### Amendment No. 3 to the Trust Agreement

132.    Amendment No. 3 amended Paragraph B of the Trust Agreement to provide that "the Trustee's fiduciary authority with respect to the Plan shall be that of a directed trustee" and direction would be provided by the ESOP Committee, except with respect to matters related to or claims against the funds held in the "escrow account created under the Stock Purchase Agreement."

### Rainbow Amends its Articles of Incorporation

133.    Twenty-one days after the closing, Rainbow Disposal filed Amended and Restated Articles of Incorporation on October 21, 2014.  The Restated Articles eliminated the requirement that Rainbow be employee-owned.  The Restated Articles recite that they have been approved by a vote of the shareholders, but does not set forth when that vote occurred. There was no vote by the Rainbow ESOP participants.

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK OWNERSHIP PLAN COMMITTEE et al.*, COMPLAINT - 40

**Defendants' Disclosures About the Sale of Rainbow**

    **Defendants Announce the Sale to Employee-Participants of the ESOP**

134.   An undated letter signed "GreatBanc Trust Company" addressed to "ESOP Participant" delivered around October 3, 2014 informed Plaintiffs and other ESOP participants that "all of the stock in the ESOP had been sold to Republic Services."  Despite the fact that GreatBanc's Trustee Agreement was not amended until July 10, 2014 and GreatBanc did not have discretionary authority under the Plan Document to sell the Rainbow stock in the ESOP until at least August 25, 2014, GreatBanc's letter claimed there was "a lengthy sale process in which the Company sought and received substantial offers from multiple bidders and resulting in the Company being sold to the highest bidder."  According to notes of a telephone conversation by a Rainbow employee with Bruce Shuman in November 2014, there were other, higher offers, but Jerry Moffat and Jeff Snow did not show those proposals to GreatBanc because they were negotiating future job contracts along with the sale and put their job welfare ahead of the best deal overall.

135.   In the letter delivered around October 3, 2014, GreatBanc advised the ESOP participants would "receive 75% of [their] closing cash allocation" and that the "remaining 25% (plus any additional amounts related to the post-closing adjustments of the Company's balance sheet on the closing date) will be distributed to [participants] upon IRS approval of the ESOP's termination. Any available holdback amounts will be distributed annually over 3 years, likely beginning 2015."

136.   GreatBanc's October 3rd letter did not provide ESOP Participants with (a) the sale price of the ESOP's stock, (b) any assessment of the fair market value of the stock, as assessed by an independent appraiser, (c) any further details of the sale, (d) whether any consideration was provided other than purchase of the Rainbow ESOP stock, (e) with information that the prior ESOP fiduciaries had

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK OWNERSHIP PLAN COMMITTEE et al.*, COMPLAINT - 41

1  resigned on October 1, 2014 or (e) the names or contact information (e.g. a
2  telephone number or email) of the new fiduciaries or any contact information of
3  anyone from whom they could ask questions about the status of their ESOP
4  accounts.

5       137.   The next formal communication about the sale and its impact on the
6  ESOP and its participants was a letter dated October 17, 2014 from the ESOP
7  Committee signed with an illegible signature by an unidentified and unfamiliar
8  person (now believed to be Jon Black). This October 17, 2014 letter informed
9  Plaintiffs (and presumably all ESOP participants) that "all of the Company stock
10 held in the Trust" in the ESOP had "been sold in cash at a price of $17.66 per
11 share" and that October 1, 2014 was "the transaction close date."

12      138.   The October 17, 2014 letter informed ESOP participants that they
13 would receive the "cash equivalents for stock allocated to" them in three separate
14 payments.

15      • The first payment would be the equivalent of $9.97 per share
16        (issued in November 2014).

17      • The second payment would be the equivalent of up to $3.37 per
18        share – or a total payment of $13.34 per share (if no amount was
19        made available from the escrow), but would be "subject to the
20        receipt of [a] determination letter from the IRS expected in 12 to
21        18 months, reduced by [an] amount determined by the ESOP's
22        Trustee for ESOP expenses."

23      • The "potential" third payment of up to $4.37 per share – or a total
24        payment of $17.66 per share – that was "subject to closure of
25        indemnity holdback" and "will be distributed annually over 3
26        years, likely beginning in 2015 and may be reduced by any
27        liabilities that are identified during that period and reduced by an
28        amount determined by the ESOP's Trustee for ESOP expenses."

139.   There was no explanation – at least in terms that could be understood by the ESOP participants -- as to the reasons or conditions on which the amount of their payments would depend. The October 17, 2014 letter did not (a) set forth the fair market value of the stock, as assessed by an independent appraiser, (b) provide any details of the sale, or an explanation of other terms and conditions of the sale, (c) explain whether any consideration was provided other than purchase of the Rainbow ESOP stock, (d) disclose that the prior ESOP fiduciaries had resigned on October 1, 2014 or (e) provide the names or contact information (i.e. a telephone number or email) of the new fiduciaries or anyone from whom they could ask questions.

140.   Despite the October 17, 2014 letter claiming that the sale prices was $17.66 per share, it was highly unlikely that the ESOP participants would receive the "maximum" amount (but the ESOP Committee failed to disclose that). As the Form 5310 filed with the IRS on November 26, 2014 reported that the Rainbow ESOP had only received $48,815,131.29 in net proceeds to date for 3,673,620 shares, that translated into a share price of only $13.288 per share.  As $17.76 per share would translate into a complete purchase price of $64,876,129.2, that would mean that the Rainbow ESOP would receive nearly all of the $16,800,000 placed in escrow.  No reasonable and prudent fiduciary would have made that conclusion.

141.   The 2012 Form 5500 filed by Rainbow Disposal on April 15, 2014 (the most recent Form 5500 filed before the 2014 sale), reported that the ESOP, which held 100% of Rainbow stock, had approximately 3,850,473 million shares. Based on a sale of 3,850,473 shares at a price of $17.66 per share, the October disclosures by the ESOP Committee suggested a total sale price of $67.99 million. There is no explanation about the decrease of 176,853 shares.  More importantly, a statement of a maximum payout utilizing the only information available to ESOP participants at that time misleadingly conveyed a high expectation of receiving the entire escrow fund, plus earnings on undistributed monies.

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK OWNERSHIP PLAN COMMITTEE et al.,* COMPLAINT - 43

## Republic's Announces the Acquisition to the Public & the SEC

142.   In a press release dated October 1, 2014, Republic announced its acquisition of Rainbow which it described as "one of Southern California's largest independent solid waste companies."  In the press release, Republic represented that the transaction consisted of at least two components (emphasis added):

     a.   Republic acquired "Rainbow's state-of-the-art *business and facilities*" including hauling routes in Huntington Beach, Fountain Valley, Midway City, Westminster, Orange County, Newport Beach and Irvine as well as a recycling facility, a transfer station, "a compressed natural gas (CNG) refueling station, and a vehicle fleet, powered by CNG."

     b.   "*As part of the transaction*, the primary principals at Rainbow, Jerry Moffatt and Jeff Snow, have joined Republic Services, and will now lead a newly created business unit of the Company based at the Huntington Beach campus."

In the press release, Brian Bales, executive vice president, Business Development at Republic represented that "Rainbow Disposal's highly favorable and growing market position, long-term franchise agreements and diversified service offering will make a strong addition to Republic Services."  Thus, Republic described Rainbow as a company in a good financial position in a growing market.

143.   In a Form 10-Q filed by Republic on October 31, 2014 with the Securities & Exchange Commission, Republic disclosed the transaction to the SEC and the public as being for $112 million in cash plus other consideration:

In October 2014, we acquired all of the shares of Rainbow Disposal Co., Inc. (Rainbow) for $112 million cash and entered into agreements not to compete, along with other restrictive covenants, with key executives. We also assumed capital lease agreements for operational facilities in Southern California.  Rainbow's operations in

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK OWNERSHIP PLAN COMMITTEE et al.*, COMPLAINT - 44

Southern California include hauling routes, a recycling facility, a transfer station, a compressed natural gas (CNG) refueling station, and a CNG-powered vehicle fleet.

144.   In contrast to the disclosures made to the ESOP Participants, Rainbow disclosed in its Press Release and Form 10-Q that the October 1, 2014 Transaction consisted of (1) a payment of $112 million in cash, not merely $68 million, (2) agreements with key executives and (3) assumption of lease agreements.

## Republic Discloses Its Intent to Terminate the Plan

145.   In late November 2014, a "Notice to Interested Parties" advised that Republic would make an application to the IRS for a determination on whether the Rainbow ESOP met the qualification requirements of the Internal Revenue Code to be terminated. This Notice was issued to "all present employees with accrued benefits under [the Rainbow ESOP] and their collective bargaining agent, if any, and all former employees with vested benefits under the plan and all beneficiaries of deceased former employees currently receiving benefits under the Plan."

146.   The "Notice to Interested Parties" advised that the "interested parties" could either submit comments directly to the IRS or request that the Department of Labor submit comments to the IRS.  The Notice to Interested Parties advised that in order for the Department of Labor to comment, at least 10 employees had to make a request in writing by no later than December 11, 2014.

147.   On December 8, 2014, Plaintiffs Hurtado, Ortega, Urquiza, Valadez and 6 other employee-participants in the ESOP submitted a hand-delivered request to the Department of Labor requesting comments by the Department of Labor on the Termination of the Rainbow ESOP.  Among other issues, this letter explained that those participants had obtained a copy of Republic's Form 10-Q filed with the Securities & Exchange Commission in October 2014 that disclose that Republic had paid $112 million and had also entered into agreements with certain members of Rainbow management.

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK OWNERSHIP PLAN COMMITTEE et al.*, COMPLAINT - 45

148.   After receiving no response from the Department of Labor, Plaintiffs hired counsel to submit comments on their behalf directly to the IRS as advised in the Notice to Interested Parties.  On January 9, 2015, Plaintiffs' then-counsel, Kira Hettinger, sent a letter via overnight delivery, submitting comments to the IRS that the proposed termination did not meet the qualification requirements.

149.   None of the Plaintiffs nor their counsel received any communication from the Department of Labor or the Internal Revenue Service in response to their letter submitted with respect to the requests submitted on December 8, 2014 or January 9, 2015.

**An Application To Terminate the ESOP is Filed with the IRS**

150.   On November 26, 2014, counsel for Republic and Rainbow sent by overnight delivery an Application for Determination for Terminating Plan (IRS Form 5310) for the Rainbow ESOP to the IRS.

151.   The Form 5310 disclosed the following:

- The Rainbow ESOP was terminated on October 1, 2014 when Rainbow was acquired by Republic Services.

- The Rainbow ESOP was converted from an ESOP to a profit sharing plan upon its termination.

- The Rainbow ESOP had been amended on October 1, 2014.

- The Plan assets totaled $48,820,647, of which $48,815,131 was in noninterest bearing cash and $5,516 was in interest-bearing cash.

As of November 26, 2014, none of the above information had been communicated to the participants in the ESOP.

152.   Enclosed along with the Form 5310 was a redacted version of the Unanimous Written Consent of the Directors of Rainbow by Defendants Moffat, Snow and Range "effective of October 1, 2014," which was altered to remove pages 2 and 3 (which referenced, among other items, the Stock Purchase Agreement dated August 26, 2014), and did not indicate that it had been redacted.

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK OWNERSHIP PLAN COMMITTEE et al.,* COMPLAINT - 46

1   Nor was the Stock Purchase Agreement, which was an Exhibit to the Unanimous

2   Written Consent, enclosed with the Form 5310. The Unanimous Consent was

3   altered in such a way to prevent a reader from realizing that the Stock Purchase

4   Agreement had been an Exhibit.

5       153.   The Form 5310 enclosed the Trust Agreement with Amendments, but

6   did not include the Amendment to the Trustee Engagement Agreement dated July

7   10, 2014.

8   **Republic Files Its Annual Report with the SEC**

9       154.   In its 2014 10-K annual report filed with the SEC on February 23,

10  2015, Republic Services described the terms of its acquisition of Rainbow as

11  follows:

12          In October 2014, we acquired all of the shares of Rainbow Disposal

13          Co., Inc. (Rainbow) for $112.0 million cash, of which $16.8 million

14          of the funds were placed into an escrow account pursuant to a

15          holdback arrangement and classified as restricted cash. We also

16          assumed a capital lease agreement with a fair value of $25.2 million

17          for operational facilities in Southern California, and entered into

18          agreements not to compete, along with other restrictive covenants,

19          with key executives.

20      155.   In its 2014 10-K annual report filed with the SEC on February 23,

21  2015, Republic Services provided the following information:

22          We allocated $53.5 million of the purchase price to property and

23          equipment, $34.8 million to intangible assets, and we assumed $18.9

24          million of liabilities. Approximately $66 million of the remaining

25          purchase price was allocated to goodwill and represents the future

26          economic benefits expected to arise from other assets acquired that

27          could not be individually identified and separately recognized.

28

156.   Based on the disclosures in Republic's 10-K, the total consideration paid by Republic for Rainbow (other than agreements with Rainbow executives) appears to be $112 million in cash plus the assumption of $18.9 million in liabilities, or a total of $130.9 million.

157.   Based on the disclosures in Republic's 10-K, Republic appears to have valued its acquisition of Rainbow somewhere between $154.3 million to $179.5 million as illustrated below (in millions):

| Property & Equip | $53.5 | Property & Equip | $53.5 |
|---|---|---|---|
| Intangible Assets | $34.8 | Intangible Assets | $34.8 |
| Goodwill | $66.0 | Goodwill | $66.0 |
| | | Lease | $25.2 |
| Total | $154.3 | Total | $179.5 |

**ESOP Fiduciary Communications to Participants in 2015**

158.   After the Notice to Interested Parties in November 2014, the next communication by any fiduciary of the Rainbow ESOP to ESOP participants concerning the sale or the distribution of proceeds occurred in late November 2015.  An unsigned letter from the ESOP Committee dated November 20, 2015 enclosed an undated letter from GreatBanc.  The GreatBanc letter disclosed to ESOP participants for the first time that "[t]he total purchase price was approximately $112,000,000." The GreatBanc letter stated that "$16.8 million of the purchase price" was in an "escrow account [] to account for indemnification claims and other adjustments."

159.   The November 2015 letter did not explain (a) why the total purchase price was $112 million, but the ESOP and its participants would receive far less, (b) provide any explanation as to the other components of consideration for the sale (i.e. what the $112 million paid for), (c) provide the fair market value of the stock, as assessed by an independent appraiser, (b) provide any details of the sale,

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK OWNERSHIP PLAN COMMITTEE et al.,* COMPLAINT - 48

1   or an explanation of other terms and conditions of the sale, (c) explain, at least not
2   in terms that the average participant could understand, under what circumstances
3   the ESOP participants might receive all or part of the money in Escrow, (d)
4   disclose that the prior ESOP Committee members had resigned on October 1, 2014
5   or (e) provide the names or contact information (i.e. a telephone number or email)
6   of the new fiduciaries or anyone from whom they could ask questions.

7   **ESOP Fiduciary Communications to Participants in 2016**

8        160.   After the November 20, 2015 letter, the next communication by any
9   fiduciary of the Rainbow ESOP to ESOP participants concerning the sale or the
10  distribution of proceeds occurred in April 2016. A letter from the ESOP
11  Committee dated April 11, 2016 announced that the IRS has issued a favorable
12  determination letter regarding the termination of the Rainbow ESOP.  The April
13  11, 2016 letter advised that there would be letter from "ESOP's third-party
14  administrator" advising whether there are "any additional amounts" allocated to
15  participant accounts "under the ESOP."

16       161.   After the April 11, 2016 letter, the next communication by any
17  fiduciary of the Rainbow ESOP to ESOP participants concerning the sale or the
18  distribution of proceeds occurred in late November 2016.  An undated letter from
19  GreatBanc received by Plaintiffs in late November 2016 informed ESOP
20  participants that issues related to the $16.8 million in escrow had been resolved
21  and that the "Rainbow ESOP had received $4,475,000 from the Escrow as its final
22  payment" and noted that this was 'well ahead of the scheduled October 1, 2017
23  final payment."  This additional amount translated into approximately $1.16 per
24  share.  The letter concluded by suggesting that "the amount remaining in the
25  Rainbow ESOP will be paid [to ESOP participants] in the near future."

26  **ESOP Fiduciary Communications to Participants in 2017**

27       162.   After the November 2016 letter, the next communication by any
28  fiduciary of the Rainbow ESOP to ESOP participants concerning the sale or the

distribution of proceeds occurred in August 2017.  An August 14, 2017 letter
finally notified participants that they could complete forms to take a distribution.
Enclosed with the August 14, 2017 letter was (a) a Summary Plan Description
purportedly dated October 2014, (b) a Summary Annual Report for Plan Year
ending June 30, 2016 and ending June 30, 2017, and (c) benefit statements/
certificates of participation.

163.   The August 14, 2017 letter enclosed a Summary Plan Description
purportedly dated October 2014; however, this "October 2014 SPD" had not
previously been furnished to ESOP participants.

164.   The June 30, 2016 Summary Annual Report reported that the Plan had
incurred expenses of $220,983, which consisted of $208,537 in administrative
expenses and $12,446 in benefits paid to participants.  The 2015 Form 5500 filed
with the Department of Labor on April 17, 2017 revealed that all administrative
expenses were paid for legal fees and to a mediator.  The June 30, 2016 Summary
Annual Report also reported that Plan assets were $15,130,044 at the beginning of
the year and $14,933,011 at the end of the year.  The June 30, 2016 Summary
Annual Report also reported that Plan had income of only $23,950 of which only
$17,149 was investment income.  As a result, Plan assets decreased by $197,033.

165.   The June 30, 2017 Summary Annual Report reported that the Plan had
incurred administrative expenses of $154,868, plus $14,223,381 in benefits paid to
participants. The June 30, 2017 Summary Annual Report also reported that Plan
assets were $14,933,011 at the beginning of the year and at $ 5,048,765 at the end
of the year.  The June 30, 2017 Summary Annual Report reported that Plan had
investment income of only $23,950.  The June 30, 2017 Summary Annual Report
also reported other income of $4,494,003; while the Report did not explain the
source of that income, presumably it was payment from the Escrow Account.

**The Investment of Plan Assets (& Lack Thereof) Post-Sale**

166.   On October 3, 2014, the New ESOP Committee held a meeting according to the Meeting Minutes.  One of the topics discussed was how the assets of the Rainbow ESOP should be invested.  The only person that the ESOP Committee consulted on this matter was Bryan Ward from Hewitt EnnisKnupp, (now Aon Hewitt); Mr. Ward is an investment consultant and is not a lawyer.  The ESOP Committee determined to have the Plan assets remain invested in Goldman Sachs Treasury obligations for a period of six to nine months.  Based on the absence of any further meeting minutes discussing this issue and the continued investment in treasury obligations, the ESOP Committee did not reconsider this issue.

167.   Based on the Form 5500s filed with the Department of Labor, from October 2014 to at least June 30, 2016, the Plan had at least $14.9 million of assets all of which were invested entirely and exclusively in Goldman Sachs Treasury obligations.  As a result, the Plan assets had investment income of 0.16% or less per year and a total cumulative return of less than 0.3%.

**Plaintiffs Attempt to Obtain Documents & Information About the Sale**

168.   On November 6, 2014, Chris Ortega sent a letter to the Rainbow ESOP Plan Administrator requesting that the Plan provide documents pursuant to ERISA §§ 104(b) and 404(a)(1)(A) and 29 U.S.C. §§ 1024(b) and 1104(a)(1)(A). In addition to the Plan Document, the summary plan description, the annual reports, trust agreements and other specific documents enumerated in ERISA § 104(b), Mr. Ortega's letter specifically requested the following documents as documents "under which the plan is established or operated" as provided in ERISA § 104(b) and under 404(a)(1):

      a.    Any valuation or other document used to determine the price at which [his] shares were allocated;

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK OWNERSHIP PLAN COMMITTEE et al.*, COMPLAINT - 51

b.    A copy of the most recent valuation of the Rainbow ESOP and other documents setting forth how the value of [his] shares were determined;

c.    Any direction issued by the Committee pursuant to Section 5(d) of the Plan Document to the Trustee to sell the Rainbow stock;

d.    A report relating to the termination of the Plan, including the terms on which any Plan assets were sold, including any documents sufficient to explain the indemnity holdback, potential or additional ESOP expense;

e.    Any delegation by the Committee pursuant to Section 17(c) of the Plan Document to the Trustee as to how to invest Plan assets;

f.    A policy, as required by Section 17(c) of the Plan Document, for investing the Trust assets;

g.    Any rules and policies established by the Committee as were required by Section 17 of the Plan Document;

h.    Any documents appointing fiduciaries of the Plan or agreements with any persons serving as fiduciaries.

Mr. Ortega also explained that the Ninth Circuit has held ERISA § 404(a)(1)(A) and § 104(b) require the plan administrator to provide participants with documents that allow the participant to "know exactly where he stands with respect to the plan – what benefits he may be entitled to, what circumstances may preclude him from obtaining benefits, what procedures he must follow to obtain benefits and who are the persons to whom management and investment of his plan funds have been entrusted." For each of the requests, Mr. Ortega explained the reasons why those documents met this Ninth Circuit standard for disclosure.

169.    In a letter (without letterhead) dated December 5, 2014, Jon Black responded (without identifying his position or relationship to the ESOP) and

asserted that "some of the categories of documents" that Mr. Ortega "requested contain sensitive commercial, non-public information" and therefore Mr. Ortega was required to sign a "Confidentiality and Non-Disclosure Agreement" by December 9, 2014 in order to receive any of the requested documents.  Mr. Black did not identify which categories of documents were considered "confidential." None the documents requested by Mr. Ortega – including the Plan Document, the summary plan description, the Form 5500– were provided along with the December 5, 2014 letter.

170.   On December 9, 2014, Mr. Ortega sent a letter via email to Jon Black on behalf of the Plan Administrator (a) advising that the assertion that some documents were confidential could not justify production of other documents which were not confidential, (b) explaining and citing case law that documents that were required to be provided pursuant to ERISA § 104(b) could not be withheld based on assertions of confidentiality, (c) requesting that the Plan Administrator identify which documents that the Plan Administrator contends were not subject to disclosure and which documents they would provide subject to a confidentiality agreement, and (d) explaining that the language in the proposed agreement was overly restrictive as it would prevent him from utilizing the documents for the very purpose that he needed them – i.e. to determine whether the sale was appropriate and whether he received the appropriate amount for his shares.  Mr. Ortega advised that he would be willing to enter into an appropriate confidentiality agreement, but only after the Plan Administrator specified what documents the Plan Administrator was offering to provide, which documents were claimed to be confidential and explained why the documents were claimed to be confidential.

171.   A letter dated December 10, 2014 signed by Jon Black on letterhead for the Greenberg Traurig law firm responded to Mr. Ortega's letters of November 6, 2014, November 26, 2014 and December 9, 2014.  *Despite signing the letter on Greenberg Traurig letterhead*, Mr. Black is not a lawyer and is not associated with

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK OWNERSHIP PLAN COMMITTEE et al.*, COMPLAINT - 53

that or any law firm. For the first time on November 10, 2014, Mr. Black suggested that the documents requested were "ambiguous and unclear." Mr. Black's letter did not identify for which categories of requested documents the Plan Administrator was producing documents, whether all requested documents in a particular category were being produced or what documents were being withheld based on the assertion of confidentiality.

172.   On January 20, 2015, counsel for Mr. Ortega responded to the December 10, 2014 letter.  The January 20, 2015 letter (a) explaining and citing case law that documents that were required to be provided pursuant to ERISA § 104(b) could not be withheld based on assertions of confidentiality, (b) explaining that Mr. Ortega's letter contained sufficient specificity under ERISA§§ 104(b) and 404(a)(1) and specifically requesting the valuation report that GreatBanc was required to obtain pursuant to the DOL Settlement Agreement, the Stock Purchase Agreement dated August 26, 2014 and the Transaction Documents which are referenced in the October 1, 2014 "Written Consent of the Board of Directors" and (c) explaining and citing caselaw why the requested documents were subject to production pursuant to ERISA§§ 104(b) and 404(a)(1).

173.   A letter dated February 17, 2015 signed by an attorney, Leslie Klein, on letterhead for the Greenberg Traurig law firm (an actual attorney at the firm) responded to the January 20, 2015 letter from Mr. Ortega's counsel; however, this letter did not address any of the substantive points in the January 20, 2015 letter. Instead, Mr. Klein's letter merely listed the documents that had been produced already. Mr. Klein's letter did not identify whether all requested documents in a particular category were being produced or which documents were being withheld based on the assertion of confidentiality.  The only additional document that Mr. Klein offered to have the Plan Administrator produce was the "valuation of the company [i.e. Rainbow] as of June 30, 2014 upon Mr. Ortega's agreement to a confidentiality agreement in a form acceptable to the Administrator."

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK OWNERSHIP PLAN COMMITTEE et al.,* COMPLAINT - 54

174.   The June 30, 2014 valuation report did not fall into the categories of valuation reports requested by Mr. Ortega.  The June 30, 2014 valuation was not a valuation report that properly could be used for the October 1, 2014 transaction for at least the following reasons: (1) it was an annual valuation of the company and not for purposes of a transaction and would be limited to the purpose for which it was prepared; (2) the valuation of Rainbow for that report would have been as of June 30, 2014 and not as of October 1, 2014, and (3) the valuation would not have meet the IRS requirements for a variety of reasons, including because it was more than 60 days old at the time of the October 1, 2014 transaction.

175.   An undated letter by GreatBanc sent in late November 2016 around Thanksgiving informed participants that the Rainbow ESOP Trustee and Republic Services reached a settlement agreement over certain claims made by Republic Services against "$16.8 million of the purchase price paid by Republic to Rainbow ESOP [that] was paid into an escrow account" in order "to provide for such indemnification claims."  The letter informed participants that "[a]s a result" of the settlement agreement, "the Rainbow ESOP received $4,475,000 from the Escrow as its final payment" and promised "the amounts remaining in the Rainbow ESOP would be paid to [participants] in the near future."

176.   After receiving this late November 2016 letter, Plaintiffs Maritza Quintero and Chris Ortega each made requests on January 3, 2017 and January 5, 2017 respectively pursuant to ERISA § 104(b) and 404(a)(1) for a copy of the settlement agreement as the amount (i.e. benefits) from a sale is dependent on the amount released from the Escrow and the settlement agreement was therefore a contract or other "instrument under which the plan is operated" and also met the Ninth Circuit standards for required disclosures.

177.   In a letter dated February 3, 2017, Jon Black responded on behalf of the ESOP Committee to Mr. Ortega's letter and refused to produce the settlement

1  agreement by claiming that the requested document did not need to be produced
2  pursuant to ERISA § 104(b)(4).

3     178.   In a letter dated January 25, 2017, Jon Black responded on behalf of
4  the ESOP Committee to Ms. Quintero's letter and claimed that "the Plan had no
5  record of [her] status as a beneficiary" of Jose Quintero and in order for her
6  "request to be considered that she "provide explanation of [her] claimed status as a
7  beneficiary under the Plan as well as documentation."

8     179.   On April 4, 2017, Maritza Quintero responded by letter sent by
9  certified mail and enclosed a copy of a "Beneficiary Designation" form for the
10 Rainbow ESOP signed by her father, Jose Quintero, and his wife, Beatriz Quintero
11 on August 28, 2004 designating Maritza Quintero as one of his primary
12 beneficiaries entitled to receive 33% of his ESOP benefits.

13    180.   The certified mail receipt reported that the April 4, 2017 letter was
14 received by Rainbow Disposal on April 17, 2017 and signed for by Michelle Clark,
15 Municipal & Major Accounts Manager, Rainbow Environmental Services, Inc.
16 The Plan Administrator for the Rainbow ESOP has not responded to Maritza
17 Quintero's request for documents.

18 **Plaintiff Ortega Requests Information & Attempts Informal Resolution**

19    181.   On December 16, 2015, Chris Ortega submitted a claim for benefits
20 pursuant to section 18 of the Plan, on behalf of himself and all other similarly
21 situated Plan participants.  In that letter, Mr. Ortega explained that the October 17,
22 2014 letter from the Rainbow ESOP Committee had explained Rainbow ESOP
23 stock "ha[d] been sold for cash at a price of $17.66 per share" and that he other
24 other participants would "receive cash equivalents for the stock allocated" to the
25 participants.  Mr. Ortega explained that as of that date, he had only received the
26 first of the three promised distributions, which amounted to only $9.97 per share
27 and had not received a sufficient explanation as to why a substantial part of the

28

proceeds had not been distributed.  As a result, Mr. Ortega raised the following issues:

      a.     First, as the Trustee explained more than a year after the transaction that the sale price was $112 million and not $68 million as originally represented, whether the correct amount from the sale had been or would be distributed to the ESOP participants.

      b.     Second, whether the Plan had received fair market value in the sale as determined by an independent appraiser (as required by Section 5(d) of the Plan Document and also by GreatBanc's DOL settlement agreement).

      c.   Third, the Plan appeared to be charging excessive expenses, in violation of section 17(d) of the Plan, which permits only "reasonable expenses."

      d.   Finally, the Plan had failed to provide ESOP participants with the right to vote on the sale of Rainbow as required by Section 8 of the Plan Document.

182.   In a letter dated March 14, 2016 signed by Jon Black on behalf of the Rainbow ESOP Committee, the Committee as Plan Administrator denied Mr. Ortega's claim for benefits, but refused to respond to the substance of any the issues by repeatedly asserting that Mr. Ortega's "December 16th letter does not set forth a claim for benefits under the Plan."  The Plan administer did not cite to any Plan provision or address Ortega's claims addressing Sections 5(d), 8, and 17(d) of the Plan Document. Nonetheless, the Committee's March 30, 2014 advised Mr. Ortega that he may not be entitled to file a lawsuit unless he timely filed an appeal within 60 days of the March 14, 2016 letter.

183.   On March 30, 2016, Chris Ortega timely appealed the ESOP Committee's March 14, 2016 decision. As part of his appeal, Mr. Ortega explained that he had "not received a full distribution from the sale of stock in [his] ESOP account," requested an explanation for the $44 million discrepancy and requested

1  that "the Committee reverse the initial denial of [his] claim" and "decide the
2  underlying issue[s] in [his] December 16, 2015 letter."

3      184.   In a letter dated May 26, 2016 signed by Jon Black on behalf of the
4  Rainbow ESOP Committee, the Committee as Plan Administrator denied Mr.
5  Ortega's appeal.  In its May 26, 2016 letter, the ESOP Committee stated that it
6  "continue[d] to find that the December 16th letter did not set forth a claim for
7  benefits under the Plan."  As a result, the Committee declined to address the
8  underlying issues raised in Mr. Ortega's December 16, 2015 letter and reiterated in
9  his March 30, 2016 letter.  The May 26, 2016 letter represented that the Committee
10  "ha[d] reviewed" Mr. Ortega's claim that he had "not received the full sale price
11  for [his] shares" and then represented as follows:

- The amount initially deposited into the Plan as proceeds from the
  sale of shares was $48,815,131.29 representing equity value of the
  company at the time of the sale.
- The proceeds from the sale in the amount of $48,815,131.29
  divided by the total number of shares in the Plan of 3,673,620.2829
  equals a per share price of $13.288017685.

18  In a footnote, the Committee claimed for the first time that the $112 million
19  "relates to total enterprise value rather than equity value."  The May 26, 2016 letter
20  did not disclose or explain how or when the $48.8 million equity value was
21  determined, or how or when the $112 enterprise value was determined nor was
22  there any explanation of the basis for the $63.2 million difference. The May 26,
23  2016 letter concluded by advising Mr. Ortega that he had a right to file a civil
24  action under ERISA § 502(a).

25      185.   On June 15, 2016, Chris Ortega submitted a request pursuant to 29
26  C.F.R. § 2560.503-1(h)(2)(iii) and § 2560.503-1(j)(3) for copies of "all documents,
27  records, and other information relevant to [his] claim for benefits." Pursuant to 29
28  C.F.R. § 2560.503-1(m)(8)(i) and (ii), Mr. Ortega requested "any document that

was relied upon in making the benefit determination" as well as any document that "was submitted, considered, or generated in the course of making the benefit determination, without regard as to whether such document, record, or other information was relied upon in making the benefit determination." Specifically, Mr. Ortega advised that "this should include, at minimum, documents on which [the Committee] based the amount that was deposited in the Plan, that this amount constituted the equity value, that the $112 million constituted the enterprise value, and any documents that [the Committee] reviewed, considered, or generated in arriving at the calculations in the course of deciding [his] claim for benefits [or] appeal."

186.   A letter dated July 21, 2016 signed by Jon Black on behalf of the Rainbow ESOP Committee as Plan Administrator responded to Mr. Ortega's June 15, 2016 request.  The Committee produced precisely 3 pages of additional documents, stamped "C. Ortega 00313-315," in response to Mr. Ortega's June 15, 2016 request.  The Committee did not produce documents explaining the amount that was deposited in the Plan, documents explaining how the purported $68 million equity value was calculated or how the purported $112 million enterprise value was calculated. The Committee did not produce any notes, emails or communications between the ESOP Committee members, any advice obtained, any analysis by the Committee or any advisors of the issues in Mr. Orega's December 16, 2015 letter or March 30, 2016 letter nor minutes of any meeting of the Committee deciding Mr. Ortega's claim for benefits or his appeal.

187.   Plaintiffs Antonio Hurtado, Jose Quintero, Maritza Quintero, Jorge Urquiza and Maria Valadez did not submit claims for benefits.  Based on the response by the ESOP Committee to Mr. Ortega, the ESOP Committee would have responded similarly to the other Plaintiffs if they had raised the same issues.

1

**Amounts Received By Plaintiffs**

2     188.   On June 30, 2014, Plaintiff Antonio Hurtado had 28,358.8182 shares

3     in his Rainbow ESOP account.  Utilizing the June 30, 2014 valuation of $16.67 per

4     share, Mr. Hurtado's shares were valued at $472,741.50. As of October 17, 2014,

5     Mr. Hurtado had 28,576.5027 shares in his Rainbow ESOP account.  Using the

6     June 30, 2014 valuation price of $16.67 per share, his shares would have been

7     valued at $476,370.30.  Using the $17.66 per share price in the ESOP Committee's

8     October 17, 2014 letter, Mr. Hurtado's maximum potential value was represented

9     to be $504,661.04. On November 25, 2014, he received $284,907.73 as a first

10    distribution from the sale of his stock. In July 2016, Hurtado received $111,188.15

11    as a second distribution. Based on the ESOP Committee's letter of August 14,

12    2017, Mr. Hurtado is expected to receive an additional $35,974.84 as a final

13    payment in September. Mr. Hurtado's total payments for his 28,576.5027 shares

14    will be $432,070.72, or $15.12 per share. This is summarized as follows:

| Shares as of Oct. 2014 | 28,576.5027 |
|---|---|
| Value Using $16.67 share price as of June 30, 2014 | $476,370.30 |
| Value Using $17.66 share price in Oct. 17, 2014 letter | $504,661.04 |
| First Payment (Received November 2014) | $284,907.73 |
| Second Payment (Received July 2016) | $111,188.15 |
| Final Payment (Expected September 2017) | $35,974.84 |
| Total (including Expected Payment) | $432,070.72 |
| Per Share Price Based on Expected Payment | $15.12 |

23    Thus, Mr. Hurtado will not only receive far less than the maximum potential

24    amount suggested in the ESOP Committee's October 17, 2014 letter, but he will

25    receive $44,299.58 less than what his shares were valued as of June 30, 2014.

26    189.   On June 30, 2014, Christopher Ortega had 3,296.0627 shares in his

27    Rainbow ESOP account. Utilizing the June 30, 2014 valuation of $16.67 per share,

28    Mr. Ortega's shares were valued at $54,945.37. As of October 17, 2014, Ortega

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK*
*OWNERSHIP PLAN COMMITTEE et al.,* COMPLAINT - 60

had 3,498.4898 shares in his Rainbow ESOP account.  Utilizing the June 30, 2014 valuation of $16.67 per share, Mr. Ortega's shares would have been valued at $58,319.83. Using the $17.66 per share price in the ESOP Committee's October 17, 2014 letter, Mr. Ortega's maximum potential value for his shares was represented to be $61,783.33. On November 26, 2014, he received $34,897.94 as a first distribution from the sale of his stock. In July 2016, Ortega received $13,175.79 as a second distribution. Based on the ESOP Committee's letter of September 6, 2017, Mr. Ortega is expected to receive an additional $4,362.37 as a final payment in September 2017. Mr. Ortega's total payments for his 3,498.4898 shares will be $$52,418.10, or $14.98 per share. This is summarized as follows:

| | |
|---|---|
| Shares as of Oct. 2014 | 3,498.4898 |
| Value Using $16.67 share price as of June 30, 2014 | $54,945.37 |
| Value Using $17.66 share price in Oct. 17, 2014 letter | $61,783.33 |
| First Payment (Received November 2014) | $34,897.94 |
| Second Payment (Received July 2016) | $13,175.79 |
| Final Payment (Expected September 2017) | $4,362.37 |
| Total (including expected Payment) | $52,418.10 |
| Per Share Price Based on Expected Payment | $14.98 |

Thus, Mr. Ortega will not only receive far less than the maximum potential amount suggested in the ESOP Committee's October 17, 2014 letter, but he will receive $2,527.27 less than what his shares were valued as of June 30, 2014.

190.   As of October 17, 2014, Jose Quintero had 17,960.7073 shares in his Rainbow ESOP account.  Using the June 30, 2014 valuation price of $16.67 per share, his shares would have been valued at $299,404.99. Using the $17.66 per share price in the ESOP Committee's October 17, 2014 letter, Mr. Quintero's maximum potential value was represented to be $317,186.09. On November 21, 2014, he received $179,068.25 as a first distribution from the sale of his stock. In July 2016, Plaintiff Quintero received $69,622.04 as a second distribution from the

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK OWNERSHIP PLAN COMMITTEE et al.,* COMPLAINT - 61

sale of this stock.  Based on the ESOP Committee's letter of August 14, 2017, Mr.
Quintero is expected to receive an additional $22,585.59 as a final payment in
September 2017. Mr. Quintero's total payments for his 17,960.7073 shares will be
$271,275.88, or $15.10 per share. This is summarized as follows:

| | |
|---|---|
| Shares as of Oct. 2014 | 17,960.7073 |
| Value Using $16.67 share price as of June 30, 2014 | $299,404.99 |
| Value Using $17.66 share price in Oct. 17, 2014 letter | $317,186.09 |
| First Payment (Received November 2014) | $179,068.25 |
| Second Payment (Received July 2016) | $69,622.04 |
| Final Payment (Expected September 2017) | $22,585.59 |
| Total (inlcuding Expected Payment) | $271,275.88 |
| Per Share Price Based on Expected Payment | $15.10 |

Thus, Mr. Quintero will not only receive far less than the maximum potential
amount suggested in the ESOP Committee's October 17, 2014 letter, but he will
receive $28,129.11 less than what his shares were valued as of June 30, 2014.

191.   On June 30, 2014, Jorge Urquiza had 24,814.7197 shares in his
Rainbow ESOP account and his account had a vested balance of $413,661.38.
Utilizing the June 30, 2014 valuation of $16.67 per share, Mr. Urquiza's shares
were valued at $472,741.50. As of October 17, 2014, Mr. Urquiza had 25,004.9317
shares in his Rainbow ESOP account.  Using the June 30, 2014 valuation price of
$16.67 per share, his shares would have been valued at $416,832.21.  Using the
$17.66 per share price in the ESOP Committee's October 17, 2014 letter, Mr.
Urquiza's maximum potential value was represented to be $441,587.09.  On
December 11, 2014, he received $243,110.66 as a first distribution from the sale of
his stock. In July 2016, Mr. Urquiza received $97,273.32 as a second distribution.
Based on the ESOP Committee's letter of August 14, 2017, Mr. Urquiza is
expected to receive an additional $31,476.84 as a final payment in September

2017. Mr. Urquiza's total payments for his 25,004.9317 shares will be $371,860.82, or $14.87 per share. This is summarized as follows:

| Shares as of Oct. 2014 | 25,004.9317 |
|---|---|
| Value Using $16.67 share price as of June 30, 2014 | $416,832.21 |
| Value Using $17.66 share price in Oct. 17, 2014 letter | $441,587.09 |
| First Payment (Received November 2014) | $243,110.66 |
| Second Payment (Received July 2016) | $97,273.32 |
| Final Payment (Expected September 2017) | $31,476.84 |
| Total (including Expected Payment) | $371,860.82 |
| Per Share Price Based on Expected Payment | $14.87 |

Thus, Mr. Urquiza will not only receive far less than the maximum potential amount suggested in the ESOP Committee's October 17, 2014 letter, but he will receive $44,971.39 less than what his shares were valued as of June 30, 2014.

192.   As of October 17, 2014, Maria Valadez had 2,336.4928 shares in her Rainbow ESOP account and a balance of $23,294.83. Using the June 30, 2014 valuation price of $16.67 per share, her shares would have been valued at $38,949.34.  Using the $17.66 per share price in the ESOP Committee's October 17, 2014 letter, Ms. Valadez' maximum potential value was represented to be $41,262.46. On December 11, 2014, she received $23,294.83 as a first distribution from the sale of her stock. In July 2016, Plaintiff Valadez received $9,034.99 as a second distribution. Based on the ESOP Committee's letter of August 14, 2017, Ms. Valadez is expected to receive an additional $2,936.02 as a final payment in September 2017. Ms. Valadez's total payments for her 2,336.4928 shares will be $35,265.84, or $15.10 per share. This is summarized as follows:

| Shares as of Oct. 2014 | 2,336.4928 |
|---|---|
| Value Using $16.67 share price as of June 30, 2014 | $38,949.34 |
| Value Using $17.66 share price in Oct. 17, 2014 letter | $41,262.46 |

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK OWNERSHIP PLAN COMMITTEE et al.*, COMPLAINT - 63

| First Payment (Received November 2014) | $23,294.83 |
| Second Payment (Received July 2016) | $9,034.99 |
| Final Payment (Expected September 2017) | $2,936.02 |
| Total Expected Payment | $35,265.84 |
| Per Share Price Based on Expected Payment | $15.10 |

Thus, Ms. Valadez will not only receive far less than the maximum potential amount suggested in the ESOP Committee's October 17, 2014 letter, but she will receive $3,683.50 less than what her shares were valued as of June 30, 2014.

## COUNT I
### Breach of Fiduciary Duty Under ERISA § 404(a)(1)(A), (B) & (D), 29 U.S.C. § 1104(a)(1) Against the Prior Committee Defendants & GreatBanc

193. Plaintiffs incorporate and re-allege by reference each of the foregoing paragraphs as if fully set forth herein.

194. ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administration of the plan, (B) with "care, skill, prudence, and diligence" and (D) to act in accordance with the documents and instruments governing the plan insofar as those documents and instruments are consistent with ERISA.

195. Section 5(d) of the Plan Document, which governs the sale of Company Stock, provided that the sale of Company stock "*must be made at a price not less than Fair Market Value as of the date of the sale*" and that any "decision to sell Company Stock . . . must comply with the fiduciary duties applicable under Section 404(a)(1) of ERISA." (emphasis added)

196. The duties of loyalty under ERISA § 404(a)(1)(A) and the duty of prudence under ERISA § 404(a)(1)(B) require a fiduciary to undertake an

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK OWNERSHIP PLAN COMMITTEE et al.,* COMPLAINT - 64

appropriate investigation to determination that the Plan and its participants receive adequate consideration for the assets of the Plan and the participants' accounts in the Plan.

197.   Pursuant to ERISA § 3(18), adequate consideration for an asset for which there is no generally recognized market means the fair market value of the asset determined in good faith by the trustee or the named fiduciary pursuant to the terms of the plan and in accordance with the Department of Labor regulations.  In order for the trustee or other named fiduciary to make a good faith determination of fair market value relying on an independent appraiser consistent with its duties under ERISA § 404(a)(1)(A) and (B), a fiduciary responsible for engaging in the good faith determination must investigate the expert's qualifications, provide the expert with complete and accurate information, and make certain that reliance on the expert's advice is reasonably justified under the circumstances.

198.   Section 2 of the Plan Document defines Fair Market Value as the "fair market value of Company Stock, as determined by the Trustee . . . based upon a valuation by an independent appraiser (within the meaning of Section 401(a)(28)(C) of the Code.)"

199.   As part of Defendant GreatBanc's Agreement with the Department of Labor, GreatBanc was obligated to hire a qualified valuation advisor through a rigorous selection process, oversee the valuation advisor and ensure proper documentation of a valuation report, engage in a thorough analysis of Rainbow Disposal's financial state to determine the prudence of the ESOP's sale of Rainbow Disposal's stock, document its vote for or against the sale, and ensure that any sale of Rainbow Disposal's stock is for not less than fair market value.

200.   Pursuant to IRC § 401(a)(28)(C), an independent appraiser must meet the requirements of the regulations of IRC § 170(a)(1). The regulations under IRC § 170 (which apply to IRC § 401 and are incorporated by the terms of the Plan), specifically 26 C.F.R. § 1.170A-13, require that any qualified appraisal must be

1  performed not earlier than 60 days before the applicable date, which as applied

2  here, means not earlier than 60 days before the sale of date of October 1, 2014.

3      201.   In discussing the sale of stock held by the Rainbow ESOP and the

4  valuation of that stock, the 2014 Form 5500, which is dated April 18, 2016, only

5  discusses a valuation as of June 30, 2014.  Moreover, the only valuation report

6  offered to be provided in response to Chris Ortega's ERISA § 104(b) request for

7  documents as dated as of June 30, 2014.  Based on these facts, there was no more

8  recent valuation report performed for the October 1, 2014 sale.

9      202.   As June 30, 2014 was more than 60 days before the October 1, 2014

10 sale date, the valuation of Rainbow stock performed as of June 30, 2014 was not a

11 qualified appraisal within the meaning of IRC § 170, nor within the meaning of

12 IRC § 401(a)(28)(C) and therefore nor as required by Sections 2 or 5(d) of the Plan

13 Document. Upon information and belief, neither the Trustees nor the Committee

14 obtained any additional valuation prior to the sale of Rainbow.

15     203.   Amendment No. 4 to the Plan Document purported to amend Section

16 5(d) of the Plan to provide the Trustee, Defendant Great Banc, with "the

17 discretionary authority -- without directions from the ESOP Committee, the Board

18 of Directors or any other party -- to: (i) sell all or substantially all of the

19 outstanding shares of the Company to a third party in a change of control

20 transaction, and (ii) execute and deliver instruments to effect such a sale" was

21 adopted on August 25, 2014.

22     204.   One day later, on August 26, 2014, GreatBanc authorized the sale of

23 all of Rainbow Disposal's shares to Republic Services, pursuant to a Stock

24 Purchase Agreement dated that same day. The one day that elapsed between the

25 grant of authority to GreatBanc to sell Rainbow Disposal's stock and GreatBanc

26 authorizing the sale did not provide Defendants GreatBanc with sufficient time to

27 obtain an assessment of the fair market value of Rainbow Disposal's stock

28 consistent with its fiduciary obligations pursuant to ERISA § 404(a)(1)(A) or (B),

1   its obligations under the terms of the Plan or its obligations under the DOL

2   Settlement.

3        205.   In order to comply with its fiduciary obligations, GreatBanc was

4   required to have complied with the Plan document, its Fiduciary Agreement, and to

5   investigate the independent appraiser's qualifications, provide the independent

6   appraiser with complete and accurate information, and make certain that reliance

7   on the independent appraiser's advice was reasonably justified.  Nor could

8   GreatBanc rely on the actions or activities of other persons (even other fiduciaries)

9   to comply with these requirements in order to make a good faith determination that

10   the sale of Rainbow Disposal stock was for fair market value.

11        206.   Regardless of whether GreatBanc had the authority to sell the shares

12   without direction, the Prior ESOP Committee Defendants were required pursuant

13   to Section 17(c) to review any actions by the Trustee.

14        207.   To the extent that Amendment No. 4 did not properly amend the terms

15   of the Plan Document, then GreatBanc could only sell the Rainbow stock held by

16   the ESOP pursuant to the direction of the ESOP Committee.

17        208.   Even if a fiduciary without appropriate authority authorized the sale,

18   and the June 30, 2014 valuation which was apparently relied upon was not per se

19   stale and invalid (and assuming the data, methodologies and assumptions were

20   correct and appropriate), the June 30, 2014 valuation valued the shares at $16.67

21   per share, but the Rainbow stock was sold for approximately $15.10 per share, or a

22   difference of at least $5,767,583.

23        209.   As a result of causing or permitting the sale of the Rainbow stock held

24   by the Rainbow ESOP, the Committee Defendants and GreatBanc breached their

25   fiduciary duties under ERISA § 404(a)(1)(A), (B) and (D) and caused losses to the

26   Plan and the accounts of the Class Members.

27

28

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK*
*OWNERSHIP PLAN COMMITTEE et al.*, COMPLAINT - 67

## COUNT II

### Breach of Fiduciary Duty Pursuant to ERISA § 404(a)(1)(A), (B) & (D), 29 U.S.C. § 1104(a)(1)(A), (B) & (D), For Failing to Require a Participant Vote Against the Prior Committee Defendants & GreatBanc

210.   Plaintiffs incorporate and re-allege by reference each of the foregoing paragraphs as if fully set forth herein.

211.   ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; (B) with "care, skill, prudence, and diligence" and (D) to act in accordance with the documents and instruments governing the plan insofar as those documents and instruments are consistent with ERISA.

212.   Pursuant to Section 8 of the Plan Document, "[w]ith respect to any corporate matter which involves the voting of such shares at a shareholder meeting and which constitutes a merger, consolidation, recapitalization, reclassification, liquidation, dissolution, sale of substantially all assets of a trade or business or a similar transaction specified in regulations under Section 409(e)(3) of the [Internal Revenue] Code . . . each Participant (or Beneficiary) will be entitled to give confidential instructions as to the voting of shares of Company Stock then allocated to his Company Stock Account."

213.   Section 8 of the Plan Document provides that "each participant (or Beneficiary) shall be provided with the information statement and other materials provided to Company shareholders in connection with each shareholder meeting, together with a form upon which confidential voting directions may be given to the Trustee. The Trustee shall vote shares of allocated Company Stock as directed by Participants (or Beneficiaries)."

214.   Section 8 of the Plan Document mirrors the language of IRC § 409(e)(3) and was required in order for the Rainbow ESOP to be a tax-qualified plan.

215.   As part of the Tax Reform Act of 1986, IRC § 409(e)(3) was modified to expand the range of instances in which plans must provide pass through voting rights to participants with shares allocated to their accounts.  The Report of the Senate Finance Committee on the Tax Reform Act of 1986, S. Rep. 99-313, 99th Cong. 2d Sess. (1986) explained that the change "modifies the voting requirements applicable to an ESOP" by "mandating that voting rights be passed through to participants with respect to certain enumerated issues" and requires that a plan permit participants to direct the vote under employer securities allocated to the participant accounts, regardless of whether the issue was required (by law or charter) to be decided by more than a majority vote of the outstanding common shares voted."

216.   Under the terms of Section 8 of the Plan Document, the acquisition of Rainbow Disposal by Republic Services on October 1, 2014 was a corporate matter that required the vote by the participants of the Rainbow ESOP.

217.   IRC § 409(e)(3) and therefore Section 8 of the Plan Document also requires that voting rights be passed through to participants in an ESOP when the applicable state corporate law requires matter to be submitted to a shareholder vote.

218.   As Rainbow was a California Corporation on October 1, 2014, the applicable state law was California.  Under the California Corporations Code, including Sections 1001, 1100, 1111 and 1201, the shareholders of the corporation would have been entitled to vote on the transaction.  As IRC § 409(e)(3) and therefore Section 8 of the Plan Document requires that voting rights be passed through to participants in an ESOP when a shareholder vote is required under the corporate law, the acquisition of Rainbow Disposal by Republic Services on

October 1, 2014 was a corporate matter that required the vote by the participants of the Rainbow ESOP.

219.   The participants of the Rainbow ESOP were not provided an opportunity to vote on the transaction whereby Rainbow was acquired by Republic Services.

220.   Additionally, Article Eight of Rainbow's Articles of Incorporation in effect on October 1, 2014 required that "substantially all of the outstanding shares of capital stock of the Corporation shall at all times be owned by: (a) employees of the Corporation (or a subsidiary of the Corporation); (b) any trust, partnership or limited liability company with respect to which an employee of the Corporation (or a subsidiary of the Corporation) is treated as the owner of such shares for federal income tax purposes; (c) the Corporation's Employee Stock Ownership Plan and Trust; and/or (d) individuals or entities receiving such shares as a benefit distribution pursuant to the provisions of the Corporation's Employee Stock Ownership Plan and Trust (provided that such individuals or entities must immediately resell such shares to the Corporation)."

221.   California Corporation Code § 902 required that any amendments to the Articles of Incorporation be approved by both the Board of Directors and also by the outstanding shares, which means by shareholder vote.  Prior to October 1, 2014, there was no vote by the shareholders or even of the Board of Directors to amend the Articles of Incorporation to modify or eliminate the Eighth Article of Rainbow's Article of Incorporation.

222.   Pursuant to Section 8 of the Plan Document and consistent with the requirements of IRC § 409(e)(3), the voting rights to change the Articles of Incorporation were required to be passed through to the participants of the Rainbow ESOP.

223.   The participants of the Rainbow ESOP were not provided an opportunity to vote on the transaction whereby Rainbow Disposal was acquired by Republic Services.

224.   By failing to follow the terms of the Plan Documents and allowing the participants of the Rainbow ESOP an opportunity to vote on either the acquisition of Rainbow Disposal by Republic Services on October 1, 2014 or the amendment of the Articles of Incorporation, the Prior Committee Defendants and GreatBanc breached their fiduciary duties under ERISA § 404(a)(1)(A), (B) and (D), 29 U.S.C. § 1104(a)(1)(A), (B) and (D).

225.   Even if a vote by the ESOP participants was not required pursuant to Section 8 of the Plan Document, the Prior Committee Defendants and Great Banc breached their fiduciaries duties under ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B) because no loyal and prudent fiduciary would have caused or permitted a transaction to occur which would have resulted in Rainbow being in violation of its Articles of Incorporation.

**COUNT III**
**Violation of ERISA § 102(a), 29 U.S.C. § 1022(a)**
**Against Prior Committee Defendants.**

226.   Plaintiffs incorporate and re-allege by reference each of the foregoing paragraphs as if fully set forth herein.

227.   ERISA § 102(a), 29 U.S.C. § 1022(a), requires SPDs to "be written in a manner calculated to be understood by the average plan participant" and to "be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan."

228.   The DOL Regulations implementing ERISA § 102, 29 C.F.R. § 2520.102-2(a), reiterate that the SPD "shall be written in a manner calculated to be understood by the average plan participant and shall be sufficiently comprehensive to apprise the plan's participants and beneficiaries of their rights and obligations under the plan." 29 C.F.R. § 2520.102-2(a) specifies that in order

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK OWNERSHIP PLAN COMMITTEE et al.,* COMPLAINT - 71

to fulfill these requirements, the plan administrator must "tak[e] into account such factors such as the level of comprehension and education of the typical participants in the plan and the complexity of the terms of the plan.  29 C.F.R. § 2520.102-2(a) further explains that an SPD "will usually require … the elimination of long, complex sentence. . .[and] the use of clarifying examples and illustrations" to make the terms of the SPD understandable to the average participant.

229.   The most recent SPD for the Rainbow ESOP prior to the October 1, 2014 sale is dated March 2009.  The 2009 SPD identifies Shuman (who has not been employed at Rainbow since 2013 and has not been on the Committee since 2013) and Moffat as the members of the ESOP Committee.  The failure to issue an updated SPD prior to October 2014 violated the requirements of ERISA § 104(b)(1)(B), 29 U.S.C. § 1024(b)(1)(B).

230.   The 2009 SPD provided the following information regarding participant's voting rights: "The committee usually decides how shares of Company Stock held the ESOP will be voted. *In certain important corporate matters* however, such as a merger or liquidation of the Company, *you may have the right to decide how shares of Company Stock allocated to your Company Stock Account will be voted.*" (emphasis added)

231.   The average plan participant in the Rainbow ESOP would have and did understand that they had the right to vote whether to sell the Rainbow ESOP shares to Republic.

232.   Illustrating that this language would be understood by the average participant in the Rainbow ESOP that they had the right to vote on the sale of Rainbow ESOP shares to Republic is the repeated statement in the Notes to the Financial Statements contained in the Form 5500s filed with the Department of Labor between 2009 and 2014 summarizing participants' voting rights under the Plan as follows:  "Each participant is entitled to exercise voting rights attributable

to the shares allocated to his or her account and is notified by the trustee prior to the time that such rights are to be exercised."

233.   To the extent that the terms of the Plan Document did not actually provide ESOP participants with the right to vote on the sale of Rainbow to Republic, the Prior Committee Defendants violated their duties under ERISA § 102(a), 29 U.S.C. § 1022(a) by furnishing Plaintiffs and the Class with SPDs that conveyed that they would have the right to vote on certain corporate matters.

234.   Plaintiffs and the Class were harmed as a result of the Prior Committee Defendants violations with respect to the SPD because they were not provided with an opportunity to vote on whether the Rainbow ESOP should sell its shares to Republic.

## COUNT IV
**Breach of Fiduciary Duty Pursuant to ERISA § 404(a)(A)(1)(A) & (B), 29 U.S.C. § 1104(a)(A)&(B) For Failure to Disclose Information About the Sale Against The ESOP Committee Defendants & GreatBanc**

235.   Plaintiffs incorporate and re-allege by reference each of the foregoing paragraphs as if fully set forth herein.

236.   ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and …. (B) with "care, skill, prudence, and diligence."

237.   An ERISA fiduciary's duty of loyalty and prudence under ERISA § 404(a)(1)(A) and (B) includes a duty to disclose and inform.  Those duties not only require that a fiduciary comply the specific disclosure provisions in ERISA, but also require (a) a duty not to misinform, (b) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful, and (c) a duty to convey complete and accurate information material to the circumstances of the participants and beneficiaries.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

238.   In the Ninth Circuit, a participant in an ERISA plan is entitled to know exactly where he stands with respect to the plan, including the benefits to which he or she may be entitled, the circumstances may preclude him from obtaining benefits, what procedures he must follow to obtain benefits, and who are the persons to whom the management and investment of his plan funds have been entrusted.

239.   The ESOP Committee Defendants and GreatBanc breached these duties at least with regard to the following statements and omissions:

   a.   The ESOP Committee Defendants and GreatBanc failed to disclose the (a) any assessment of the fair market value of the Rainbow stock as assessed by an independent appraiser, (b) details about the consideration paid in the sale, including the total consideration and the fact that Republic had paid $112 million in cash (until Plaintiffs let them know that they knew based on SEC filings), or that Republic had entered into agreements with Rainbow management as part of the sale, (c) the value which Republic had placed on the acquisition of Rainbow.

   b.   The ESOP Committee Defendants and GreatBanc failed to disclose the terms of the Stock Purchase Agreement or provide any meaningful, understandable summary of its terms.

   c.   The New ESOP Committee Defendants and GreatBanc failed to adequately disclose and explain the terms and circumstances surrounding the various payments and holdbacks so that the ESOP participants could understand the benefits to which they may be entitled and the circumstances that may preclude them from obtaining benefits.

   d.   The New ESOP Committee misleadingly claimed in their October 17, 2014 letter that the stock had been sold for $17.66 per share – which would have resulted in a total net proceeds to the Rainbow ESOP based on 3,673,620 shares of $64,876,129,20 – when the total net proceeds

received by the Plan, as disclosed in the 2014 Form 5500 on April 16, 2016 was only $50,829,073, or $13.836 per share or was $48,815,131.29, or $13.288 per share as reported in the Form 5310 and by the ESOP Committee on May 26, 2016.  The New ESOP Committee knew or was reckless in not knowing that there was no realistic possibility that the ESOP participants would receive $17.66 per share for their shares.

e.      The New ESOP Committee Defendants and GreatBanc failed to disclose to the ESOP participants why the Plan only received $48.8 million, not the $64 million suggested by the October 17, 2014 letter or even the $50.8 million disclosed on the 2014 Form 5500.

f.      The ESOP Committee Defendants and GreatBanc failed to disclose that the Articles of Incorporation of Rainbow required employee ownership, directly or indirectly, and that amendment of the Articles required shareholder approval and therefore participant voting.

g.      The ESOP Committee Defendants failed to disclose that the Prior ESOP Committee Defendants had resigned, that there were New ESOP Committee members or the names or contact information for any fiduciary who could respond to questions from participants about their benefits and so that the ESOP participants could understand the benefits to which they may be entitled and the circumstances that may preclude them from obtaining benefits.

h.      GreatBanc failed to identify a single person at or contact information for any person at GreatBanc who could respond to questions from participants about their benefits and so that the ESOP participants could understand the benefits to which they may be entitled and the circumstances that may preclude them from obtaining benefits.

i.      The New ESOP Committee Defendants and GreatBanc failed to disclose to the ESOP Participants that the ESOP had been terminated on October 1, 2014 and the Plan had been converted to a profit sharing plan.

j.      The New ESOP Committee Defendants failed to disclose that the Plan Document had been amended on October 1, 2014 as part of the terms of the Stock Purchase Agreement or provide a summary of the terms of the changed terms until August 14, 2017.  The New ESOP Committee Defendants then misleadingly labeled the SPD distributed in August 2017 as the October 2014 SPD to suggest that it had been furnished to ESOP participants three years earlier.

k.      The New ESOP Committee Defendants failed to disclose to ESOP participants until at least August 2017 (a) that the assets of the Plan post-transaction were undiversified and (b) did not disclose until nearly three years after the sale that the assets of the Plan post-transaction were earning so little investment income that plan expenses were diminishing the amount of principal.

240.   As the ESOP participants were not provided information to know where they stood with respect to the plan, including the benefits to which they would receive, how the Plan assets were invested, what circumstances would preclude them from obtaining benefits or who the fiduciaries were, they were harmed including by being prevented from or dissuaded from taking action to protect their rights and benefits.

**COUNT V**
**Prohibited Transactions in Violation of ERISA**
**§ 406(b)(1) & (3), 29 U.S.C. § 1106(b)(1) & (3)**
**Against Defendants Moffatt and Snow**

241.   Plaintiffs incorporate and re-allege by reference each of the foregoing paragraphs as if fully set forth herein.

242.   ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1) provides that "a fiduciary with respect to a plan shall not deal with the assets of the plan in his own interest or for his own account."

243.   ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3) provides that "a fiduciary with respect to a plan shall not receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

244.   Defendant Moffat was a fiduciary of the Plan as a member of the ESOP Committee prior to October 1, 2014.  Defendant Moffatt and Snow were fiduciaries of the Plan as members of the Board of Directors of Rainbow, which had oversight over the ESOP Committee and the Trustee and because they acted on behalf of the Plan in negotiating the terms of the sale of Rainbow stock owned by the Plan.

245.   In its SEC Form 10-Q, but not in communications with participants of the Rainbow ESOP, Republic disclosed that as part of the October 1, 2014 sale of Rainbow to Republic, Republic entered into "agreements not to compete along with restrictive covenants, with key executives."

246.   As described in an October 1, 2014 Press Release, "[a]s part of the transaction, the primary principals at Rainbow, Jerry Moffatt and Jeff Snow, have joined Republic Services, and will now lead a newly created business unit of the Company based at the Huntington Beach campus."

247.   Based on the information in the SEC Form 10-Q and the Press Release, Defendants Moffatt and Snow, negotiated and entered into agreements as part of the sale of Rainbow that ensured their continued employment or payments after sale of Rainbow to Republic.

248.   By negotiating the terms of the sale of the assets of the Rainbow ESOP to include agreements that provided benefits, including continued

employment for themselves, Defendants Moffatt and Snow dealt with the assets of the Plan in their own interest in violation of ERISA § 406(b)(1).

249.   As a party to or beneficiary of agreements that provided consideration to themselves from Republic directly or indirectly through Rainbow, Defendants Moffat and Snow received consideration for their own account from a party dealing with the Rainbow ESOP in connection with a transaction involving the assets of the Plan in violation of ERISA § 406(b)(3).

## COUNT VI
### Prohibited Transactions  In Violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D) Against Defendants GreatBanc, Moffatt and Snow

250.   Plaintiffs incorporate and re-allege by reference each of the foregoing paragraphs as if fully set forth herein.

251.   ERISA § 406(a)(D), 29 U.S.C. § 1106(a)(D) provides that "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan and a party in interest."

252.   ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A) defines a "party in interest" to include "any fiduciary . . . of such employee benefit plan" as well as "an employer any of whose employees are covered by such plan." As fiduciaries of the ESOP in 2014 before the October 2014 Transaction, Defendant Moffatt was a party in interest pursuant to ERISA § 3(14) (A).

253.   ERISA § 3(14)(H), 29 U.S.C. § 1002(14)(H) defines a "party in interest" to include "an employee, officer, director (or an individual having powers or responsibilities similar to those of officers or directors) of a person described in subparagraph" (C), among other subparagraphs.  Subparagraph (C) refers to ERISA § 3(14)(C), 29 U.S.C. § 1002(C), which defines a party in interest to include "an employer any of whose employees are covered by such plan."

Rainbow was a party in interest pursuant ERISA § 3(14)(C). As officers and directors of Rainbow, Defendants Moffat and Snow were parties in interest pursuant to ERISA § 3(14)(H).

254.   In its SEC Form 10-Q and SEC Form 10-K, but not in communications with participants of the Rainbow ESOP, Republic disclosed that as part of the October 1, 2014 sale of Rainbow to Republic, Republic entered into "agreements not to compete along with restrictive covenants, with key executives."

255.   As described in an October 1, 2014 Press Release, "[a]s part of the transaction, the primary principals at Rainbow, Jerry Moffatt and Jeff Snow, have joined Republic Services, and will now lead a newly created business unit of the Company based at the Huntington Beach campus."

256.   Based on the information in the SEC Form 10-Q, Form 10-K and the Press Release, Defendants Moffatt and Snow, negotiated and entered into agreements as part of the sale of Rainbow that ensured their continued employment or payments after sale of Rainbow to Republic.

257.   Any difference between what Republic paid or would have paid or what was received by Rainbow ESOP participants, that would have increased the amount that the funds received by the Rainbow ESOP participants from the sale of the assets of the Plan if Defendants Moffat and Snow not received the benefits of these agreements that ensure their continued employment constitutes a direct or indirect transfer to, use by or for the benefit of a party interest of the assets of the Rainbow ESOP and two parties in interest, Defendants Moffat and Snow, within the meaning of ERISA § 406(a)(D), 29 U.S.C. § 1106(a)(D).

258.   As the language of Amendment No. 4 modified Section 5(d) of the Plan Document to provide the Trustee with the discretionary authority to sell the shares of Rainbow held by the Rainbow ESOP, Defendant Great Banc knew or should have known of these agreements and caused the Rainbow ESOP to engage in the transaction for the sale of the Rainbow ESOP. By causing the Rainbow

ESOP to engage in a transaction which included such agreements, Defendant Great Banc caused the plan to engage in a prohibited transaction in violation of ERISA § 406(a)(D), 29 U.S.C. § 1106(a)(D).

259.   By negotiating the terms of the sale of the assets of the Rainbow ESOP to include agreements that provided benefits at time when the Committee had discretionary authority to act before the enactment of Amendment No. 4, Defendant Moffat caused the plan to engage in a prohibited transaction in violation of ERISA § 406(a)(D), 29 U.S.C. § 1106(a)(D).

260.   As parties in interest, Defendants Moffat and Snow are liable for the violations of ERISA § 406(a)(D), 29 U.S.C. § 1106(a)(D) pursuant to ERISA § 502(a)(3).

## COUNT VII
### Prohibited Transactions in Violation of ERISA § 406(b)(1) & (3), 29 U.S.C. § 1106(b)(1) & (3)
### Against Defendant Range

261.   Plaintiffs incorporate and re-allege by reference each of the foregoing paragraphs as if fully set forth herein.

262.   ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1) provides that "a fiduciary with respect to a plan shall not deal with the assets of the plan in his own interest or for his own account."

263.   ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3) provides that "a fiduciary with respect to a plan shall not receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

264.   Defendant Range was a fiduciary of the Plan as a member of the Board of Directors of Rainbow, which had oversight over the ESOP Committee and the Trustee and because he acted on behalf of the Plan in negotiating the terms of the sale of Rainbow stock owned by the Plan.

265.   In an announcement dated January 8, 2015, which appears on the website at https://www.stoutadvisory.com/news/srr-served-exclusive-financial-advisor-rainbow-environmental-services, Gregory Range's firm, Stout, announced that "Stout served as exclusive financial advisor to Rainbow in connection with the sale of the company" and that "Gregory Range, Managing Director and head of Stout's Los Angeles office," along with Jeffrey Shippy, Director, "led the execution of the transaction."  This information was not disclosed directly to the ESOP Participants.

266.   As Stout was likely paid for its services and Range, as Director, likely received  consideration connected with that payment, Defendant Range dealt with the assets of the Plan in his own interest in violation of ERISA § 406(b)(1) and received consideration for their own account from a party dealing with the Rainbow ESOP in connection with a transaction involving the assets of the Plan in violation of ERISA § 406(b)(3).

## COUNT VIII
### Breach of Fiduciary Duty Pursuant to ERISA § 404(a)(A)(1)(A) & (B), 29 U.S.C. § 1104(a)(A)&(B) For Failure to Manage a Chose in Action Against The ESOP Committee Defendants & GreatBanc

267.   Plaintiffs incorporate and re-allege by reference each of the foregoing paragraphs as if fully set forth herein.

268.   ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and …. (B) with "care, skill, prudence, and diligence."

269.   Pursuant to Paragraph A of the Trust Agreement, GreatBanc was required to hold all assets of the Plan in Trust.  Pursuant to Paragraph C of the Trust Agreement, GreatBanc's authority and power included the following:

(8)   "sue, defend, compromise, arbitrate or settle any suit or legal
proceeding or any claim due it on which it may be liable;"

(10)   "employ agents, legal counsel, independent appraisers,
actuaries, accountants or other persons … for such purposes as the
Trustee considers desirable; and"

(11)   "perform all acts which the Trustee shall deem necessary or
appropriate and exercise all powers and authority under this
Agreement.

270.   Pursuant to Section 17(c) of the Plan Document, the ESOP Committee
also had "all powers necessary to enable it to administer the Plan and Trust
Agreement in accordance with their provisions, including without limitation the
following:"

(6)   engaging any administrative, legal, accounting, clerical or other
services that it may deem appropriate;

(9)   reviewing the performance of the Trustee with respect to the
Trustee's administrative duties, responsibilities and obligations under
the Plan and Trust Agreement.

271.   Among the assets of an employee benefit plan under ERISA is a
"chose in action" – the right to bring an action to recover a debt, money or a thing
– including to institute a lawsuit for a breach of fiduciary duties or other violations.

272.   ERISA fiduciaries are prohibited from engaging in transactions under
ERISA § 406(a) or 406(b) unless there is an exception or an exemption.  In a 100%
ESOP owned company, a misuse of company assets arises to a misuse of Plan
assets because the Plan's value is directly related to the company's value such that
a misuse in company funds negatively affects the company's value and in turn the
ESOP's value.  As a result, one of the assets of the Plan was a claim against Moffat
and Shuman for engaging in prohibited transactions and associated breaches of

fiduciary duty by engaging in the transactions such as Southeastern Renewables and West Florida Recycling for their own benefit.

273.   California Corporate Code voids self-dealing transactions and under California corporate law, makes it a violation of the fiduciary duty of officers or directors to give away or appropriate to themselves corporate assets, including corporate opportunities.  As a result, one of the assets of the Plan, as the sole shareholder, was a claim against Moffat and Shuman for engaging in breaches of their corporate fiduciary duty by engaging in the transactions such as Southeastern Renewables and West Florida Recycling for their own benefit.

274.   Moffatt and Shuman breached their corporate fiduciary duties and violated ERISA by utilizing the assets of Rainbow Disposal to invest in Southeastern Renewables and West Florida Recycling and arranging for themselves to have a personal ownership interest in transactions in which their only contribution for ownership interest was to contribute the expertise and skills for which Rainbow Disposal was already compensating them. Without the prospect for personal enrichment from Southeastern Renewables and West Florida Recycling, Moffat and Shuman would not have caused Rainbow Disposal to invest in these companies. As a result of the investments in Southeastern Renewables and West Florida Recycling, Rainbow incurred significant losses.

275.   As explained in Note 2 to Rainbow ESOP's June 30, 2013 Financial Statement attached to the Form 5500, "[s]ignificant changes in the Company's operating results will impact the value of the common stock and, accordingly, the Plan is subject to the same risks as the Company's operations and related concentrations. . . A reduction in the Company's cash flow . . . impact[s] the ability of the Company to provide cash to the Plan for the redemption of stock from participants."

276.   The value of Rainbow stock decreased by 35 percent between 2011 and 2012 and then an additional 10 percent from 2012 to 2013. This decline

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK OWNERSHIP PLAN COMMITTEE et al.*, COMPLAINT - 83

coincided with and was primarily caused by Rainbow Disposal's investment in non-core businesses such as West Florida Recycling and Southeastern Renewables.

277.   As fiduciaries of the Rainbow ESOP, the ESOP Committee and the Trustee had the ability to bring actions on behalf of the Plan pursuant to ERISA § 502(a)(2) and ERISA § 502(a)(3).

278.   As the sole shareholder of Rainbow, the ESOP through its fiduciaries could have taken action or exercised its authority to require the Board to take action to pursue any claims under California corporate law.

279.   Neither the ESOP Committee Defendants nor GreatBanc took any action, including any legal action or exercise another authority under the Plan Document or the Trust Agreement with respect to these claims and properly manage this chose in action.

280.   Had either the Prior ESOP Committee Defendants or GreatBanc filed an action or properly raised these claims prior to the October 1, 2014 sale, under California law, claims of self-dealing and breaches of fiduciary duty must be considered by an appraiser in considering the fair value of a shareholder's stock.

281.   By failing to take action or properly manage this chose in action, the ESOP Committee Defendants and Defendant GreatBanc violated ERISA §§ 404(a)(1)(A), (B), and (D), 29 U.S.C. §§ 1104(a)(1)(A), (B) and (D). As a result of the breaches, the Plan suffered a loss and the ESOP participants who are members of the Class correspondingly suffered losses to their particular accounts.

## COUNT IX
**Failure to Provide Documents Upon Request Pursuant to ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4) & ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A) Against New ESOP Committee Defendants By only Plaintiffs Ortega and Maritza Quintero.**

282.   Plaintiffs incorporate and re-allege by reference each of the foregoing paragraphs as if fully set forth herein.

283.   ERISA § 104(b)(4) provides that the administrator of an employee benefit plan "shall, upon written request of any participant or beneficiary, furnish a copy of certain enumerated documents as well as "other instruments under which the plan is established or operated" to the requesting participant or beneficiary within 30 days of the Request.

284.   In the Ninth Circuit, the documents that a plan administrator must provide pursuant to ERISA § 104(b)(4) are those that allow the participant to "know[ ] exactly where he stands with respect to the plan—what benefits he may be entitled to, what circumstances may preclude him from obtaining benefits, what procedures he must follow to obtain benefits, and who are the persons to whom the management and investment of his plan funds have been entrusted."

285.   The Ninth Circuit has recognized that a fiduciary's duty under ERISA § 404(a)(1)(A) to disclose is not limited to those specified in the statute, but extends to additional disclosures to the extent that they relate to the provision of benefits or the defrayment of expenses.

286.   Plaintiff Chris Ortega sent a letter to the Rainbow ESOP Plan Administrator requesting that the Plan provide specified documents pursuant to ERISA §§ 104(b) and 404(a)(1)(A), 29 U.S.C. §§ 1024(b) and 1104(a)(1)(A), on November 6, 2014.

287.   The Plan Administrator, the New ESOP Committee Defendants, did not provide all of the documents requested pursuant to Mr. Ortega's November 6, 2014 letter within 30 days as required by ERISA §§ 104(b) and 404(a)(1)(A), 29 U.S.C. §§ 1024(b) and 1104(a)(1)(A),

288.   On January 3, 2017, Maritza Quintero sent a letter to the Rainbow ESOP Plan Administrator requesting that the Plan provide a copy of the settlement agreement between the Rainbow Trustee and Republic Services pursuant to ERISA §§ 104(b) and 404(a)(1)(A), 29 U.S.C. §§ 1024(b) and 1104(a)(1)(A), on January 3, 2017.  As the amount of benefits that participants and beneficiaries is entitled to

receive is dependent on the amount released from the Escrow account, which is based on the settlement agreement, the settlement agreement is a contract or other instrument under which the plan is operated" and required to be disclosed pursuant to ERISA §§ 104(b) and 404(a)(1)(A), 29 U.S.C. §§ 1024(b) and 1104(a)(1)(A).

289.   The Plan Administrator, the New ESOP Committee Defendants, failed to produce the document(s) requested pursuant to Ms. Quintero's January 3, 2017 letter within 30 days as required by ERISA §§ 104(b) and 404(a)(1)(A), 29 U.S.C. §§ 1024(b) and 1104(a)(1)(A). The Plan Administrator, the New ESOP Committee Defendants, also failed to produce the document(s) requested pursuant to Ms. Quintero's January 3, 2017 letter within 30 days after she provided them with documentation proving that she was a beneficiary under the Plan.

290.   On January 5, 2017, Chris Ortega sent a letter to the Rainbow ESOP Plan Administrator requesting that the Plan provide a copy of the settlement agreement between the Rainbow Trustee and Republic Services pursuant to ERISA §§ 104(b) and 404(a)(1)(A), 29 U.S.C. §§ 1024(b) and 1104(a)(1)(A), on January 3, 2017.  As the amount of benefits that participants and beneficiaries is entitled to receive is dependent on the amount released from the Escrow account, which is based on the settlement agreement, the settlement agreement is a contract or other instrument under which the plan is operated" and required to be disclosed pursuant to ERISA §§ 104(b) and 404(a)(1)(A), 29 U.S.C. §§ 1024(b) and 1104(a)(1)(A).

291.   The Plan Administrator, the New ESOP Committee Defendants, failed to produce the document(s) requested pursuant to Ms. Quintero's January 3, 2017 letter within 30 days as required by ERISA §§ 104(b) and 404(a)(1)(A), 29 U.S.C. §§ 1024(b) and 1104(a)(1)(A).

292.   Pursuant to ERISA § 502(a)(1)(A) a participant may sue for the relief provided in ERISA § 502(c). Pursuant to ERISA § 502(c), 29 U.S.C. § 1132(c), "[a]ny administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by [ERISA] to furnish" by

mailing the requested material to "the requesting participant . . . within 30 days after such request" may be liable for up to $110 per day in civil penalties. As a result of the New ESOP Committee Defendants' failure to produce the requested documents, they are liable for the penalties available under ERISA § 502(c).

## COUNT X
### Breach of Fiduciary Duty Under ERISA § 404(a)(1)(A), (B), (C) & (D), 29 U.S.C. § 1104(a)(1) For Failing to Properly Invest Plan Assets After October 1, 2014 Against the New ESOP Committee Defendants and GreatBanc

293.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (B) with "care, skill, prudence, and diligence" and (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and (D) to act in accordance with the documents and instruments governing the plan insofar as those documents and instruments are consistent with ERISA.

294.    Section 5(a) of the Plan Document provides that the "Trustee shall invest any Trust Assets that are not invested in Company Stock in such prudent investments as the Committee deems to be desirable for the Trust, or the Trust Assets may be held temporarily in cash."

295.    According to the 2014 Form 5500 filed with the Department of Labor dated April 18, 2016 and the 2015 Form 5500 filed with the Department of Labor dated April 17, 2017, all of the Plan's assets, approximately $14.9 million, has been invested entirely in short-term treasury obligations since the sale.

296.    By definition, investment of 100% of the Plan assets in a single type of asset, even in treasury obligations, is undiversified.

297.   Based on the October 17, 2014 letter from the New ESOP Committee that was sent to all ESOP participants, the Committee estimated that these funds would not be distributed for at least 12 to 18 months.

298.   A letter from GreatBanc Trust Company received by participants in late November 2016 acknowledged that it had originally estimated final payment on October 1, 2017.

299.   Based on the estimated payment dates, both GreatBanc and the New ESOP Committee Defendants were aware that there was no need for all of these funds to be invested in short term investments.

300.   No prudent or loyal fiduciary would have invested 100% of the assets of the Plan in short term treasury obligations over 12 to 18 months (or even over 9 months) or longer.  As this period of time was not temporary, nor was the expected period of time temporary, investing 100% of the Plan's assets in short term treasury obligations also was inconsistent with the terms of the Plan.

301.   To the extent that Section 5(a) is construed to expressly provided that the Trustee is subject to the direction of the Committee and does not have discretion to invest the Plan assets without direction, GreatBanc knew or should have known that the Committee's direction to invest 100% of the assets in a single investment was inconsistent with the terms of the Plan and was also contrary to ERISA.

302.   To the extent that the language of Section 5(d) as amended by Amendment No. 5 was construed to suggest that the Plan's assets should not be diversified, a prudent fiduciary would have disregarded that instruction in favor of diversification as the Supreme Court had expressly held on June 25, 2014 in *Fifth Third Bancorp v. Dudenhoeffer*, 134 S.Ct 2459 (2014) that ERISA § 404(a)(1)(D), 29 U.S.C. § "makes clear that the duty of prudence trumps the instructions of a plan document," even an instruction in the plan to invest exclusively in a particular investment.

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK OWNERSHIP PLAN COMMITTEE et al.,* COMPLAINT - 88

303.   If merely 60% of these Plan assets (i.e. $9 million) had been invested in an S&P 500 index fund between October 1, 2014 and July 7, 2017, those assets would have returned 32.11% or $2.89 million dollars. (Calculations performed using https://dqydj.com/sp-500-return-calculator/).  If the other 40% of these Plan assets were investment in AAA corporate bonds, those assets would have returned 12.138% or $728,280 (Calculations performed using https://dqydj.com/investment-grade-corporate-bond-total-return-calculator-aaa-aa-a/).  A prudent, but very conservative alternative investment of these Plan assets would have yielded at least $3.618 million. By contrast, the Plan only earned $17,149 in interest from July 1, 2015 through June 30, 2016 and $18,723 in interest from July 1, 2016 through June 30, 2017.

304.   By failing to prudently invest and diversify the assets of the Plan after October 1, 2014, the New Committee Defendants and GreatBanc breached their fiduciary duties under ERISA § 404(a)(1)(A), (B), (C) and (D), 29 U.S.C. § 1104(a)(1)(A), (B), (C) and (D).

## COUNT XI
**Breach of Duty to Monitor Pursuant to**
**ERISA § 404(a)(1)(A) & (B), 29 U.S.C. § 1104(a)(1)(A) & (B)**
**Against the ESOP Plan Committee Defendants and the Director Defendants**

305.   Plaintiffs incorporate and re-allege by reference each of the foregoing paragraphs as if fully set forth herein.

306.   Pursuant to Section 17(c)(9) of the Plan Document, the ESOP Committee had the authority and responsibility to "review[] the performance of the Trustee with respect to the Trustees' administrative duties, responsibilities and obligations under the Plan and Trust Agreement."

307.   Pursuant to Section 2 of the Plan Document, the Board of Directors of Rainbow appointed the Trustee and the ESOP Committee. Pursuant to the authority, the Rainbow Board had a duty to monitor the Trustee's conduct and the

ESOP Committee members' conduct, to take appropriate action if those fiduciaries were not adequately protecting the interests of the ESOP participants.

308.  The Prior Committee Defendants, and the Board of Directors (Moffatt, Snow and Range) knew or in the exercise of reasonable diligence, should have known that GreatBanc as Trustee (a) had failed to conduct a reasonable and good faith investigation of the price of Rainbow stock, (b) had failed to determine whether the sale was consistent with the terms of the Plan Document, (c) had caused or permitted the Plan to engage in prohibited transactions, and (d) had failed to properly manage a chose in action.

309.  The Rainbow Board of Directors (Moffatt, Snow and Range) knew or in the exercise of reasonable diligence, should have known that the ESOP Committee (a) had failed to determine whether the sale was consistent with the terms of the Plan Document including by failing to hold a vote by participants, (b) had caused or permitted the Plan to engage in prohibited transactions, and (c) had failed to properly manage a chose in action.

310.  The New Committee Defendants knew or in the exercise of reasonable diligence, should have known that GreatBanc as Trustee (a) had failed to conduct a reasonable and good faith investigation of the price of Rainbow stock, (b) had caused the Rainbow ESOP to engage in a transaction for and receive less than adequate consideration for Rainbow stock, (c) had failed to make sufficient and accurate disclosures to ESOP participants about material terms about the sale, (d) had failed to act consistent with the terms of the Plan Document, including by failing to hold a vote by participants, (e) had caused or permitted the Plan to engage in prohibited transactions, and (f) had failed to properly manage a chose in action.

311.  By failing to properly monitor and/or take appropriate action against the Trustee, the ESOP Committee Defendants and the Board of Directors (Moffatt,

Snow and Range) breached their fiduciary duties under ERISA § 404(a)(1)(A) & (B), 29 U.S.C. § 1104(a)(1)(A) &(B).

312.   By failing to properly monitor and/or take appropriate action against the Prior ESOP Committee Defendants, the Board of Directors (Moffatt, Snow and Range) breached their fiduciary duties under ERISA § 404(a)(1)(A) & (B), 29 U.S.C. § 1104(a)(1)(A) &(B).

<u>**COUNT XII**</u>
**Co-Fiduciary Liability Pursuant to ERISA § 405, 29 U.S.C. § 1105**
**Against the ESOP Committee Defendants, Moffatt, Snow, Range and**
**GreatBanc**

313.   Plaintiffs incorporate and re-allege by reference each of the foregoing paragraphs as if fully set forth herein.

314.   ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach when (1) "he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission of such other fiduciary is a breach;" (2) "by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach;" or (3) "he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

315.   The Prior ESOP Committee Defendants violated ERISA § 405(a)(1)-(3) when they knowingly participated in each other's violations when they acted as a Committee because (1) they each participated knowingly in the actions taken as a Committee and knew or were reckless in not knowing it was a breach, (2) failed to fulfill their duties as members of the Committee set forth in the Plan Document and (3) had knowledge of those breaches and made no apparent efforts to remedy the breach. As such, each of the Prior ESOP Committee Defendants is liable for

the breaches of the other members of the Committee pursuant to ERISA §

405(a)(1), (2) and (3), 29 U.S.C. § 1105(a)(1), (2) and (3).

316.   The Prior ESOP Committee Defendants violated ERISA § 405(a)(2) and/or (3) with respect to GreatBanc as follows because they had an obligation pursuant to Section 17(c)(9) to review the following breaches of the Trustee and either failed to fulfill those duties or had knowledge of the breaches and failed to make any efforts to remedy the breaches:

a.   The Prior ESOP Committee Defendants knew or should have known consistent with their responsibilities that GreatBanc did not have an independent appraiser's assessment of the fair market value of the ESOP's stock as of the date of sale and failed to take steps to ensure that the sale was for no less than fair market value;

b.   The Prior ESOP Committee Defendants knew or should have known consistent with their responsibilities that GreatBanc did not provide the ESOP participants with the opportunity to vote their shares of stock for or against the sale to Republic Services;

c.   The Prior ESOP Committee Defendants knew or should have known consistent with their responsibilities that GreatBanc had failed to properly manage a chose in action against Moffat and Shuman;

d.   The Prior ESOP Committee Defendants knew or should have known consistent with their responsibilities that GreatBanc had executed an indemnification provision that violates ERISA § 410 and is thus void as against public policy.

As such, the Prior ESOP Committee Defendants are liable for the breaches of Great Banc pursuant to ERISA § 405(a) (2) and (3), 29 U.S.C. § 1105(a) (2) and (3).

317.   GreatBanc, Moffatt, Snow and Range violated ERISA 405(a)(1)-(3) when they participated knowingly in the respective prohibited transactions

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK OWNERSHIP PLAN COMMITTEE et al.*, COMPLAINT - 92

because (1) they each participated knowingly in the respective prohibited transactions, (2) failed to fulfill their duties as members of the Committee set forth in the Plan Document and (3) had knowledge of those breaches and made no apparent efforts to remedy the breach. As such, each of them is liable for the breaches of the other members of the others as to each of those transactions pursuant to ERISA § 405(a)(1), (2) and (3), 29 U.S.C. § 1105(a)(1), (2) and (3).

318.   The New ESOP Committee Defendants violated ERISA § 405(a)(1)-(3) when they knowingly participated in each other's violations when they acted as a Committee because (1) they each participated knowingly in the actions taken as a Committee and knew or were reckless in not knowing it was a breach, (2) failed to fulfill their duties as members of the Committee set forth in the Plan Document and (3) had knowledge of those breaches and made no apparent efforts to remedy the breach. As such, each of the New ESOP Committee Defendants is liable for the breaches of the other members of the Committee pursuant to ERISA § 405(a)(1), (2) and (3), 29 U.S.C. § 1105(a)(1), (2) and (3).

319.   The New ESOP Committee Defendants violated ERISA § 405(a)(2) and/or (3) with respect to GreatBanc's Disclosures to ESOP Participants regarding the Sale because (1) they participated knowingly in at least some of the disclosures by transmitting the disclosures and knew or were reckless in not knowing it was a breach, (2) they had an obligation pursuant to ERISA § 404(a)(1)(A) and the Plan Document to ensure complete and accurate information was being transmitted to participants and pursuant to Section 17(c)(9) of the Plan Document to review the actions of the Trustee or (3) had knowledge that the communications were not complete and accurate or were misleading because they had knowledge of the full truth and failed to make any efforts to remedy the breaches:

**COUNT XIII**

**Knowing Participation in Breaches of Fiduciary Duties & Prohibited
Transactions Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)
Against Defendant Republic Services**

320.    Plaintiffs incorporate and re-allege by reference each of the foregoing paragraphs as if fully set forth herein.

321.    Defendant Republic Services knew about the existence of the Rainbow ESOP as the Stock Purchase Agreement expressly provided that the Plan would be terminated after the sale and because Republic Services was purchasing all of the Rainbow shares from the Rainbow ESOP.

322.    Defendant Republic Services also knew that Defendants Moffat, Snow, and Range were fiduciaries of the ESOP as a result of either their membership on the ESOP Committee and/or membership on the Board of Directors of Rainbow.  Defendant Republic Services also knew that GreatBanc was the trustee of the Rainbow ESOP.

323.    Defendant Republic Services would have known at least of the following breaches of fiduciary duty and prohibited transactions in the October 2014 Transaction and at the time of the October 2014 Transaction as a result of its due diligence:

    a.    The sale was not for adequate consideration within the meaning of ERISA § 3(18);

    b.    The fiduciaries of the Rainbow ESOP had not held a vote by the ESOP participants on the sale consistent with the terms of the Plan Document;

    c.    Rainbow's Articles of Incorporation required employee ownership, the Articles of Incorporation could not be changed without shareholder vote, and the fiduciaries of the Rainbow ESOP had not held a vote by the ESOP participants;

       d.     Moffat, Snow and Range had engaged in the transactions which constitute prohibited transactions; and

       e.     The corporate officers and directors, including Moffat, had engaged in breaches of their corporate fiduciary duty, which had caused losses to Rainbow, negatively affecting the value of Rainbow and its stock and these breaches had not been remedied.

324.   Despite knowledge of these breaches and violations, Defendant Republic Services proceeded to close the transaction to purchase Rainbow Disposal on October 1, 2014.

325.   By knowingly participating in these breaches and violations, Defendant Republic Services is subject to appropriate equitable relief including disgorgement of any profits, having a constructive trust placed on any proceeds received (or which are traceable thereto), having the sale rescinded, requiring all or part of stock to be restored to the Rainbow ESOP accounts or be subject other appropriate equitable relief.

## COUNT XIV
### Violation of ERISA § 410 & Breach of Fiduciary Under ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. § 1110 & §§ 1104(a)(1)(A) and (B) Against Fiduciary Defendants

326.   Plaintiffs incorporate and re-allege by reference each of the foregoing paragraphs as if fully set forth herein.

327.   ERISA § 410(a), 29 U.S.C. § 1110(a), provides in relevant part (with exceptions not applicable here) that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part [ERISA Part IV] shall be void as against public policy." As Part IV of ERISA includes ERISA §§ 404, 405, and 406, 29 U.S.C. §§ 1104, 1105 and 1106, any provision that attempts to relieve a

fiduciary of liability is void pursuant to ERISA § 410(a), unless there is an exception or exemption. No such exception or exemption is applicable here.

328. The DOL Regulations promulgated under ERISA § 410, 29 C.F.R. § 2509.75-4, renders "void any arrangement for indemnification of a fiduciary of an employee benefit plan by the plan" because it would have "the same result as an exculpatory clause, in that it would, in effect, relieve the fiduciary of responsibility and liability to the plan by abrogating the plan's right to recovery from the fiduciary for breaches of fiduciary obligations."

329. For a 100% ESOP-owned company, a provision requiring indemnity by the ESOP-owned company is treated as an indemnity provision by the Plan because it effectively requires ESOP participants to pay for the costs of the breaching fiduciaries' liability.

330. Section 17(g) of the Plan Document purports to "indemnify each member of the Committee (to extent permitted by law) against any personal liability or expense, including reasonable attorneys' fees resulting from his service on the Committee, except such liability or expense as may result from his own willful misconduct."

331. To the extent that Section 17(g) of the Plan Document attempts to relieve the ESOP Committee Defendants from their responsibility or liability for their breaches of fiduciary duties under ERISA or have Rainbow (while it was an ESOP-owned company) or thereby the Rainbow ESOP be responsible for their liability or breaches Section 17(g) is void as against public policy.

332. Section 14 of the October 7, 2002 "Successor Trustee Engagement Agreement" between GreatBanc and Rainbow Disposal purports to disclaim any responsibility by GreatBanc to pay for "any loss, cost, expense, or other damage, including attorneys' fees suffered by any of the Indemnitees [defined as GreatBanc and its officers, directors, employees, and agents] resulting from or incurred with respect to any legal proceedings related in any way to the performance of services

by any one or more of the Indemnitees." Section 15(b) of Successor Trustee Engagement Agreement purports to require Rainbow Disposal to "reimburse the Indemnitees for all reasonable costs that they incur in connection with any Proceeding."  Section 17 of the Successor Trustee Engagement Agreement states, "[i]f a court of competent jurisdiction shall hold that any payment or award of indemnification pursuant to the terms of this Agreement shall be unavailable to any one or more of the Indemnitees from the Company for any reason other than their gross negligence or willful misconduct, the Company then shall reimburse the affected Indemnitees, as required by Section 14, but taking into account the basis for the denial of full indemnification by the court."

333.   To the extent that Sections 14, 15, and 17 of the Successor Trustee Engagement Agreement attempts to relieve the ESOP Committee Defendants from their responsibility or liability for their breaches of fiduciary duties under ERISA or have Rainbow (while it was an ESOP-owned company) or thereby the Rainbow ESOP be responsible for their liability or breaches Sections 14, 15, and 17 are void as against public policy.

334.   To the extent that any fiduciaries of the Plan would agree to such an indemnity provision that is against public policy under ERISA § 410, that fiduciary breached his or her fiduciary duties under ERISA by failing to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries (A) for the exclusive purpose of providing benefits to participants and beneficiaries and (B) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and aims, in violation of ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B).

1

**ENTITLEMENT TO RELIEF**

2      335.   By virtue of the violations set forth in the foregoing paragraphs,

3  Plaintiff and the Class are entitled to sue each of the Fiduciary Defendants pursuant

4  to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), for relief on behalf of the Plan as

5  provided in ERISA § 409, 29 U.S.C. § 1109, including for recovery of any losses

6  to the Plan, the recovery of any profits resulting from the breaches of fiduciary

7  duty, and such other equitable or remedial relief as the Court may deem

8  appropriate.

9      336.   By virtue of the violations set forth in the foregoing paragraphs,

10 Plaintiff and the Class are entitled pursuant to ERISA § 502(a)(3), 29 U.S.C. §

11 1132(a)(3), to sue any of the Defendants for any appropriate equitable relief to

12 redress the wrongs described above.

13

**PRAYER FOR RELIEF**

14      Wherefore, Plaintiffs, on behalf of themselves and the Class, pray that

15 judgment be entered against Defendants on all claims, and request that the Court

16 order or award the following relief:

17      A.    Declare that each of the above fiduciary Defendants breached his, her

18 or its fiduciary duties under ERISA.

19      B.    Require each fiduciary found to have breached his/her/its fiduciary

20 duties to the Plans to jointly and severally restore all losses to the Plans that resulted

21 from the breaches of fiduciary duty, or by virtue of liability pursuant to ERISA §

22 405, to disgorge any profits.

23      C.    Declare that Plaintiffs and the Class were and are entitled to vote on

24 whether the Rainbow ESOP should be sold to Republic Services either under the

25 terms of the Plan or reforming the terms of the Plan consistent with the SPD and

26 requiring such a vote to be take place.

27      D.    Require that the Trustee and the ESOP Committee Defendants be

28 required to provide an accounting of the proceeds of the sale to Republic Services.

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK*
*OWNERSHIP PLAN COMMITTEE et al.,* COMPLAINT - 98

1       E.      Declare any transaction that constitutes a prohibited transaction void

2 and (1) requiring any fiduciary or party-in-interest to disgorge any profits made, (2)

3 declaring a constructive trust over the proceeds of any such transaction or (3) any

4 other appropriate equitable relief, whichever is in the best interest of the Rainbow

5 ESOP.

6       F.      Require that the proceeds of any recovery for the Rainbow ESOP be

7 allocated to the accounts of participants in the Rainbow ESOP (other than any

8 Defendants) in proportion to the injury that they suffered as a result of the breach of

9 fiduciary duty.

10       G.      Require the forfeiture of any interest in the Rainbow ESOP of any

11 fiduciary alleged to have breached his fiduciary duty to the Plan to the extent

12 necessary to make whole the innocent participants of the Rainbow ESOP who were

13 participants at the time of the 2014 Transaction.

14       H.      Order the removal any of the breaching fiduciaries from their position

15 as fiduciaries for the Rainbow ESOP and enjoin any of the breaching fiduciaries

16 from acting as fiduciaries for any plan that covers any Rainbow employees or any

17 members of the Class.

18       I.      Appoint an Independent Fiduciary to manage the Rainbow ESOP to

19 the extent necessary.

20       J.      Order (i) a constructive trust be placed on the proceeds received by

21 Republic Service in the sale, (ii) disgorgement of profits made by the Republic

22 Services, (iii) rescission of the sale of stock by Republic Services, or (iv) any other

23 appropriate equitable relief against the Republic Services, whichever is in the best

24 interest of the Rainbow ESOP.

25       K.      Order pursuant to ERISA § 206(d)(4) that any amount to be paid to

26 the ESOP accounts of the Class can be satisfied by using or transferring any

27 breaching fiduciary's ESOP account in the Plan (or the proceeds of that account) to

28 the extent of that fiduciary's liability.

*HURTADO, et al. v. RAINBOW DISPOSAL CO., INC. EMPLOYEE STOCK
OWNERSHIP PLAN COMMITTEE et al.*, COMPLAINT - 99

L.      Declare that any indemnification agreement between Defendants and the Rainbow ESOP or Rainbow Disposal violated ERISA § 410, 29 U.S.C. § 1110 and is therefore null and void.

M.      Award Plaintiffs Christopher Ortega and Maritza Quintero statutory penalties in the amount of $110 per day, per violation, for the failure to provide each of the requested documents that the New ESOP Committee Defendants failed to provide.

N.      Require Defendants to pay attorney's fees and the costs of this action pursuant to ERISA §502(g)(1), 29 U.S.C. § 1132(g)(1) and/or ordering the payment of reasonable fees and expenses of this action to Plaintiffs' Counsel on the basis of the common benefit and/or common fund doctrine (and/or other applicable law) out of any money or benefit recovered for the Class and Subclasses in this action.

O.      Award pre-judgment and post-judgment interest.

P.      Award any such other relief that the Court determines that Plaintiffs and the Class are entitled pursuant to ERISA §502(a), 29 U.S.C. § 1132(a) and pursuant to Rule 54(c) of the Federal Rules of Civil Procedure or otherwise.

Dated: September 15, 2017

Respectfully submitted,

R. Joseph Barton Cal Bar No. 212340
*Admitted to C.D. Cal.*
BLOCK & LEVITON
1735 20th Street, N.W.
Washington, D.C. 20009
Tel: (202) 734-7046
Fax: (617) 5047-6020
Email: jbarton@blockesq.com

Joseph Creitz Cal Bar No. 169552
*Admitted to C.D. Cal.*
CREITZ & SEREBIN LLP
100 Pine St., Suite 1250
San Francisco, CA 94111
Tel: 415/466-3090
Fax: (415) 513-4475
Email: joe@creitzserebin.com

*Attorneys for Plaintiffs*